THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA

v.

CHANGPENG ZHAO,

      Defendant.

CASE NO. CR 23-179 (RAJ)

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

# TABLE OF CONTENTS

I.    CASE BACKGROUND ................................................................................................ 2

    A.    The Information and Guilty Plea ................................................................... 2

    B.    Settlement of Multi-Agency Proceedings ..................................................... 3

II.   THE SENTENCING GUIDELINES ...................................................................... 4

    A.    Stipulation ..................................................................................................... 4

    B.    The Proceeds of Unlawful Activity Enhancement is Not Applicable ................. 4

III.  APPLICABLE LAW ............................................................................................. 8

IV.   MR. ZHAO SHOULD BE SENTENCED TO PROBATION ........................................ 9

    A.    The Nature and Circumstances of the Offense ..................................................... 9

    ■ ████████████████████████████████████████████████

    C.    Mr. Zhao's Personal History and Circumstances Support Lenience ................. 14

        1.    Mr. Zhao's Devotion to His Family ................................................ 14

        2.    Mr. Zhao Built Binance as a Force for Positive Change ........................ 16

            (a)    The Vision Behind Binance ........................................ 16

            (b)    Binance's Early Days and Compliance Efforts ........................ 18

            (c)    Mr. Zhao and Binance as Forces for Good in Cryptocurrency .......................................................... 20

        3.    Mr. Zhao's Commitment to the Greater Good ................................ 25

    D.    Mr. Zhao Has Shown Extraordinary Acceptance of Responsibility .................. 30

    E.    Precedent and the Need to Avoid Sentencing Disparities Warrant Probation .......................................................................................................... 31

    F.    Mr. Zhao's Sentence Should Account for the Harsher Conditions He Would Face, as a Noncitizen, If Incarcerated ..................................................... 40

    G.    The Remaining 18 U.S.C. § 3553(a) Factors Also Support Probation ................ 45

        1.    Deterrence .......................................................................................... 45

        2.    Protection of the Public ........................................................... 47

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

i

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

3.     Needed Training or Rehabilitation.........................................48

4.     Seriousness of the Offense, Respect for the Law, and Just Punishment............................................................................48

V.     CONCLUSION........................................................................................50

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

ii

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*CFTC v. Changpeng Zhao, et al.*,
No. 23-cv-1887 (N.D. Ill. 2024) ............................................................... 11

*Gall v. U.S.*,
552 U.S. 38 (2007) ...................................................................................... 8

*Kimbrough v. U.S.*,
552 U.S. 85 (2007) ...................................................................................... 8

*Peugh v. U.S.*,
569 U.S. 530 (2013) .................................................................................... 8

*Rombakh v. U.S.*,
2015 WL 4483961 (W.D. Wash. July 21, 2015) .................................... 4, 6

*U.S. v. Ali*,
No. 17-cr-224 (N.D. Tex. 2017) .......................................................... 35, 36

*U.S. v. Alshafei*,
No. 15-cr-34-RAJ (W.D. Wash. 2015) ................................................... 31

*U.S. v. Anderson*,
533 F.3d 623 (8th Cir. 2008) ................................................................. 49

*U.S. v. Bakeas*,
987 F. Supp. 44 (D. Mass. 1997) ........................................................... 42

*U.S. v. Barker*,
771 F.2d 1362 (9th Cir. 1985) ............................................................... 46

*U.S. v. Beaman*,
128 F. Supp. 2d 1188 (N.D. Ind. 2001) ................................................... 5

*U.S. v. Binance Holdings Ltd.*,
No. 23-cr-178 (W.D. Wash. 2024) ......................................................... 11

*U.S. v. Binance Holdings Ltd.*,
No. 23-cr-178 (W.D. Wash. 2023) .................................................... *passim*

*U.S. v. Cohen*,
No. 19-cr-741 (S.D.N.Y. 2020) ............................................................. 42

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

iii

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    *U.S. v. Cohen*,
2        No. 22-cr-265 (E.D. Pa. 2024) ........................................................................31

3    *U.S. v. Connolly, et al.*,
        No. 16-cr-370 (S.D.N.Y. 2019) ...............................................................42, 44
4
     *U.S. v. Davoudi*,
5        172 F.3d 1130 (9th Cir. 1999) .......................................................................41

6    *U.S. v. Ferreria*,
7        239 F. Supp. 2d 849 (E.D. Wis. 2002).........................................................42

8    *U.S. v. Finkelstein*,
         229 F.3d 90 (2d Cir. 2000)...............................................................................6
9
     *U.S. v. Fitch*,
10       No. 16-cr-00123 (S.D. Cal. 2016) ..................................................................32

11   *U.S. v. G & A Check Cashing et al.*,
12       No. 12-cr-560 (C.D. Cal. 2013) .....................................................................35

13   *U.S. v. Gonzalez*,
         No. 21-cr-1319 (S.D. Cal. 2022)....................................................................31
14
     *U.S. v. Harder*,
15       144 F. Supp. 3d 1233 (D. Or. 2015) ..............................................................48

16   *U.S. v. Hayes, et al.*,
17       No. 20-cr-500 (S.D.N.Y. 2020) .............................................................. *passim*

18   *U.S. v. Hayes*,
         No. 20-cr-005 (S.D.N.Y. 2022) ......................................................................47
19
     *U.S. v. Koo*,
20       No. 23-cr-00568 (C.D. Cal. 2024) ..................................................................31

21   *U.S. v. Lewis*,
22       No. 23-cr-370 (S.D.N.Y. 2024) ...............................................................42, 49

23   *U.S. v. Liew*,
         No. 17-cr-01 (N.D. Ill. 2021) .........................................................................44
24
     *U.S. v. Lopez-Salas*,
25       266 F.3d 842 (8th Cir. 2001) .........................................................................41

26   *U.S. v. Lu*,
         No. 13-cr-15-RAJ (W.D. Wash. 2013) ..........................................................32

SENTENCING MEMORANDUM ON BEHALF                                    LATHAM & WATKINS LLP
OF DEFENDANT CHANGPENG ZHAO                          1271 Avenue of the Americas, New York, NY 10020
(*United States v. Changpeng Zhao*, CR23-179-RAJ)      iv                              (212) 906-1200

*U.S. v. Miller,*
No. 13-cr-445 (E.D. Pa. 2014) ........................................................................32

*U.S. v. MoneyGram Int'l, Inc.,*
No. 12-cr-291 (D. Minn. 2018) ........................................................................36

*U.S. v. Ofer,*
No. 21-cr-174 (E.D.N.Y. 2023) .....................................................................6, 31

*U.S. v. Panzera,*
No. 11-cr-591 (E.D.N.Y. 2014) .....................................................................33, 34

*U.S. v. Randol,*
No. 23-cr-440 (C.D. Cal. 2024) ......................................................................34

*U.S. v. Robson, et al.,*
No. 14-cr-272 (S.D.N.Y. 2014) .......................................................................44

*U.S. v. Sarao,*
No. 15-cr-75 (N.D. Ill. 2015) ..........................................................................44

*U.S. v. Shepard,*
No. 18-cr-147-RAJ (W.D. Wash. 2018) ..........................................................32

*U.S. v. Simalavong,*
924 F. Supp. 610 (D. Vt. 1995) ......................................................................42

*U.S. v. Singh,*
995 F.3d 1069 (9th Cir. 2021) ..........................................................................5

*U.S. v. Stewart,*
590 F.3d 93 (2d Cir. 2009) ..............................................................................49

*U.S. v. The Western Union Co.,*
No. 17-cr-11 (M.D. Pa. 2017) ........................................................................36

*U.S. v. Ulmer,*
No. 15-cr-53-RAJ (W.D. Wash. 2015) ...........................................................32

*U.S. v. Walchli,*
No. 20-cr-000497 (S.D.N.Y. 2024) .................................................................42

*Walker v. U.S.,*
2012 WL 4675447 (N.D. Cal. Sept. 27, 2012) .................................................5

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

v

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

# STATUTES

18 U.S.C.
    § 3553(a)(1) ........................................................................................................................8
    § 3553(a)(1)-(2) .................................................................................................................8
    § 3553(a)(5)-(6) .................................................................................................................8
    § 3553(a)(6) .....................................................................................................................31

31 U.S.C.
    § 5318(h) .....................................................................................................................2, 34
    § 5322 .............................................................................................................................34
    § 5322(b) ...........................................................................................................................2
    § 5322(c) ...........................................................................................................................2
    § 5322(e) ...........................................................................................................................2

U.S.S.G.
    § 2S1.3(a)(1) .....................................................................................................................4
    § 2S1.3(b)(1) .....................................................................................................................4
    § 2S1.3(b)(2) .....................................................................................................................4
    § 3B1.1(a) ..........................................................................................................................4
    § 3E1.1(a) ..........................................................................................................................4
    § 3E1.1(b) ..........................................................................................................................4
    § 5B1.1 ..............................................................................................................................9
    § 5D1.1 ............................................................................................................................41

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

vi

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

Defendant Changpeng Zhao, by and through his undersigned counsel, respectfully submits this Sentencing Memorandum in connection with his upcoming sentencing on April 30, 2024.

Mr. Zhao has pleaded guilty to a single offense: failing to establish an adequate anti-money laundering ("AML") program that complied with the Bank Secrecy Act ("BSA") at Binance Holdings Limited ("Binance" or the "Company"), a global business with more than 170 million devoted users around the world who value its innovative products and services. Mr. Zhao deeply regrets his offense, and he has shown exceptional acceptance of responsibility and remediation. After transforming Binance into an industry leader on compliance and collaboration with law enforcement, Mr. Zhao traveled to the United States voluntarily from a non-extradition country to plead guilty and resigned from his role as Chief Executive Officer ("CEO") of the Company. Since then, he has remained in the United States, away from his home and family for over five months.

Mr. Zhao has paid massive fines. He directed the Company to plead guilty before this Court and to resolve related civil charges with three federal agencies. ██████████ ████████████████████████████████████████████████████████████ ████████ These factors strongly favor lenience. As Probation noted in the final paragraph of its detailed presentence report ("PSR"): "[I]n contemplating a sentence outside of the advisory guideline system, the Court may wish to consider the defendant's exceptional acceptance of responsibility, ████████████████████████████████████ the time the defendant has spent in the United States, his lack of criminal history, the collateral consequences of his status as a noncitizen, and the collateral consequence of Mr. Zhao stepping down as Binance CEO." PSR ¶ 156.

The charge to which Mr. Zhao pleaded guilty is a serious one, and Mr. Zhao's public profile coupled with the $4.3 billion fine and forfeiture in Binance's parallel corporate case has attracted a high degree of media attention to this matter. ████████████████████████████ ████████████████████████████ No defendant in a remotely similar BSA case has *ever* been sentenced to incarceration. Mr. Zhao should not be the first.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

1

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    Given the need to avoid unwarranted sentencing disparities, Mr. Zhao's extraordinary

2    acceptance of responsibility ████████████████, his long history of philanthropy and

3    community service, the five and a half months he has already spent away from his family since

4    pleading guilty, and the collateral consequences of his conviction, Mr. Zhao respectfully requests

5    that the Court sentence him to probation.

6    <center>**I.    CASE BACKGROUND**</center>

7    **A.    The Information and Guilty Plea**

8    Mr. Zhao was not indicted, was not extradited, did not put the government to its burden of

9    proof at trial, and never wavered in his steadfast commitment to accepting responsibility.

10    On November 14, 2023, the government filed a single-count Information charging Mr.

11    Zhao with failing to maintain an effective AML program under the BSA, in violation of 31 U.S.C.

12    §§ 5318(h) and 5322(b), (c), and (e).  Dkt. 1 ¶¶ 1, 27.  That same day, the government filed a

13    parallel Information against Binance for failing to comply with provisions of the BSA and U.S.

14    sanctions law.  *U.S. v. Binance Holdings Ltd.*, No. 23-cr-178 (W.D. Wash. 2023), Dkt. 1.

15    On November 21, 2023, both Mr. Zhao and the Company pleaded guilty pursuant to written

16    plea agreements.  *See* Dkt. 31; *Binance*, No. 23-cr-178, Dkt. 21.  The parties stipulated to a $50

17    million fine for Mr. Zhao, pursuant to 31 U.S.C. § 5322(e), which the government agreed would

18    be satisfied by Mr. Zhao's payments to the Commodity Futures Trading Commission ("CFTC")

19    in his parallel resolution with that agency.  PSR ¶ 5.  Mr. Zhao completed payment of the $50

20    million on January 9, 2024.  He paid an additional $50 million to the CFTC on March 4, 2024.

21    At his plea hearing, after traveling from his home in the United Arab Emirates ("UAE") to

22    the United States, Mr. Zhao expressed remorse and his intention to "take responsibility and close

23    this chapter in my life."  Dkt. 40 at 3.  Magistrate Judge Tsuchida accepted Mr. Zhao's guilty plea

24    and granted Mr. Zhao's request that he be released on bail and permitted to return home to the

25    UAE pending sentencing.  *Id.*

26

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

2

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    On November 22, 2023, the government sought review of Judge Tsuchida's decision,

2    requesting that Mr. Zhao remain in the United States.  Dkt. 34.  On December 7, 2023, the Court

3    granted the government's motion and ordered Mr. Zhao to "remain in the continental United States

4    during the period between his plea and sentencing," Dkt. 46 at 6, which was later continued by

5    two months at the government's request, Dkt. 60.  Mr. Zhao has abided by that order and his

6    conditions of release fully, remaining in the United States away from his home, partner, and young

7    children for five and a half months.

8    **B.    Settlement of Multi-Agency Proceedings**

9    On November 21, 2023, in addition to its plea agreement, Binance also reached resolutions

10   with the Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement

11   Network ("FinCEN").  Both Mr. Zhao and the Company also simultaneously agreed to resolve

12   pending litigation with the CFTC.  Pursuant to this multi-agency resolution, Mr. Zhao and the

13   Company agreed to pay unprecedented total penalties of more than $4.3 billion and continue

14   implementing extensive compliance commitments, including installing independent monitors to

15   oversee the Company's compliance efforts for at least the next three years and cooperating with

16   the U.S. government.[1]  No. 23-cr-178, Dkt. 23, at 13-14, 21-23; PSR ¶¶ 44-46.  Additionally, Mr.

17   Zhao agreed to (and did) resign from his position as CEO of the company he founded and built

18   from the ground up.  No. 23-cr-178, Dkt. 23, at ¶ 8(f)(xiii).

19   The various resolutions, including the Company's plea agreement, recognized the

20   "significant steps" Binance has already taken, at Mr. Zhao's direction, "to remediate its AML and

21   sanctions compliance programs" years before the plea agreement.  Dkt. No. 23, ¶¶ 8(f)-(g).[2]  Mr.

22   Zhao's sentence should reflect that he personally set Binance on its corrective course before he

23

24

---

25   [1] *Inside Binance's Guilty Plea and the Biggest Fine in Crypto History*, THE WALL ST. J. (Nov. 24, 2023), available at https://www.wsj.com/finance/inside-binances-guilty-plea-and-the-biggest-fine-in-crypto-history-e959fca0.

26   [2] *See also* OFAC Enforcement Release, at 7 (Nov. 21, 2023), available at https://ofac.treasury.gov/media/932351/download?inline (noting Binance's "substantial cooperation" and "significant remedial measures" as mitigating factors).

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

3

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1  resigned as CEO.  The Company's extensive remedial measures under Mr. Zhao's leadership

2  underscore the extent of Mr. Zhao's acceptance of responsibility, even prior to his guilty plea.

3                    II.    THE SENTENCING GUIDELINES

4       A.    Stipulation

5       Mr. Zhao's plea agreement sets forth the following stipulated Guidelines provisions:

6       • A base offense level of 8, pursuant to U.S.S.G. § 2S1.3(a)(1);

7       • A two-level increase for a conviction of an offense under Chapter 53 of Title 31,
8         United States Code, and involving more than $100,000 in a twelve-month period,
          pursuant to U.S.S.G. § 2S1.3(b)(2); and

9       • A four-level increase pursuant to U.S.S.G. § 3B1.1(a).  PSR ¶ 3.

10      The plea agreement recognizes that Mr. Zhao qualifies for a two-level downward

11  adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and if Mr. Zhao's

12  offense level is 16 or greater, the government has agreed to make the motion necessary to permit

13  the Court to subtract another level pursuant to U.S.S.G. §§ 3E1.1(a) and (b).  Mr. Zhao has no

14  criminal history.  PSR ¶ 71.  Thus, his total offense level is 12, and the advisory Guideline range

15  is 10 to 16 months.  Probation agrees with this calculation.  *Id.* ¶¶ 68, 144.

16      B.    The Proceeds of Unlawful Activity Enhancement is Not Applicable

17      The parties agreed that they are free to present argument as to the applicability of a two-

18  level increase for proceeds of unlawful activity.  PSR ¶ 4.  This enhancement applies only if "the

19  defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to

20  promote unlawful activity."  U.S.S.G. § 2S1.3(b)(1).  Probation has declined to apply this

21  enhancement.  PSR ¶¶ 60-68.

22      There is no factual or legal basis to support the enhancement.  Courts—including in this

23  District—describe the relevant *mens rea* standard as heightened, referring to this provision as "the

24  deliberate knowledge enhancement."  *See Rombakh v. U.S.*, 2015 WL 4483961, at *1-3 (W.D.

25  Wash. July 21, 2015).  As such, courts have applied § 2S1.3(b)(1) when a defendant was *explicitly*

26  *informed* that specific funds were in fact the proceeds of other criminal activity, not merely when

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)                4

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

it was unclear whether the defendant knew the relevant funds constituted criminal proceeds. *See, e.g.*, *Walker v. U.S.*, 2012 WL 4675447, at *1, 5 (N.D. Cal. Sept. 27, 2012) (applying § 2S1.3(b)(1) in a structuring prosecution where defendant knew funds were derived from selling counterfeit software); *see also U.S. v. Singh*, 995 F.3d 1069, 1081-82 (9th Cir. 2021) (applying § 2S1.1(b)(1)—a different enhancement with the same heightened knowledge standard—in a money laundering prosecution where defendant knew specific funds were derived from illicit drug dealing, because a witness explicitly told defendant the "money was from . . . drugs"); *cf. U.S. v. Beaman*, 128 F. Supp. 2d 1188, 1190-93 (N.D. Ind. 2001) (enhancement did not apply in a structuring prosecution because the defendant did not know the source of the funds at issue, even though his business dealings were "certainly less than cautious"). Indeed, the Probation Office noted the requirement that a defendant have "explicit knowledge that funds were in fact the proceeds of other criminal activity" in other cases it identified in this Circuit as well. Addendum to the PSR, at 49.

Here, there is no evidence that Mr. Zhao was *explicitly informed* of any specific transaction or circumstances in which an identified user transacted on Binance with criminal proceeds. Generalized awareness, statistical probability, or "reasonable foreseeab[ility]," as described in his plea agreement, are insufficient.

The Court cannot apply this enhancement based on the mere fact that Mr. Zhao may have been aware of gaps or weaknesses in the Company's compliance controls. Generalized knowledge that the Company's compliance program did not eliminate all risk of criminal activity does not mean that Mr. Zhao knew or intended for any funds to be criminally derived (he manifestly did not). If such generalized knowledge were sufficient, this enhancement would apply in every case involving any financial institution that audits and enhances its compliance program. But in fact, even in cases involving more severe actions than Mr. Zhao's, the enhancement is not applied. *See U.S. v. Hayes, et al.*, No. 20-cr-500 (S.D.N.Y. 2020) (no enhancement even though the government made allegations not found here, such as that the defendant had personally "communicated directly

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

5

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1   with BitMEX customers who self-identified as being based in Iran");[3] *U.S. v. Ofer*, No. 21-cr-174

2   (E.D.N.Y. 2023).

3         The government is wrong that this enhancement requires only that a defendant

4   "consciously avoided" knowledge that funds were proceeds of unlawful activity.  In its response

5   to the draft PSR, the government cited this standard using a decades-old case from the Second

6   Circuit to support its proposition.  *See* Addendum to the PSR, at 42.  As demonstrated by the cases

7   cited above, "conscious avoidance" is simply not the test in this Circuit and cannot meet the

8   "deliberate knowledge" standard required here.  Moreover, even if "conscious avoidance" were

9   the appropriate test, the government has not offered evidence to satisfy even that standard.  In the

10  case on which the government relies, *U.S. v. Finkelstein*, 229 F.3d 90 (2d Cir. 2000), the defendant

11  was an active participant in an extensive money laundering conspiracy who (1) told the district

12  court judge that he knew the funds were the proceeds of unlawful activity and (2) explicitly told

13  law enforcement that he suspected the money he laundered arose from narcotics trafficking.

14  *Finkelstein*, 229 F.3d at 92-97.

15        The facts of *Finkelstein* contrast starkly with Mr. Zhao's case.  Not only was Mr. Zhao

16  never personally involved in any illicit activity, the record shows that he invested significant time

17  and resources into building the most impactful compliance and law enforcement collaboration

18  function in the industry.  *See infra* Section IV.C.2.

19        Nor is it sufficient that, as per the plea agreement, it was "reasonably foreseeable" that

20  Binance's automated matching engine—a software program that matches customer bids and offers

21  to execute cryptocurrency trades based only on the price indicated and the time submitted—would

22  or could match U.S. users with counterparties in sanctioned jurisdictions.  Dkt. 31, ¶ 9(m).  The

23  standard for § 2S1.3(b)(1) is not reasonable foreseeability; it is specific and "deliberate"

24  knowledge or belief.  *See Rombakh*, 2015 WL 4483961, at *1-3.  To warrant this enhancement,

25

26  [3] *See Founders Of Cryptocurrency Exchange Plead Guilty To Bank Secrecy Act Violations*, DOJ Press Release (Feb. 24, 2022), available at https://www.justice.gov/usao-sdny/pr/founders-cryptocurrency-exchange-plead-guilty-bank-secrecy-act-violations; *U.S. v. Hayes et al.*, No. 20-cr-500 (S.D.N.Y. 2020), Dkt. 2, ¶ 24.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)                          6

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    the facts would also need to demonstrate that Mr. Zhao himself knew or believed that his conduct

2    involved the proceeds of specific U.S. sanctions violations.  He did not.

3         Although Probation references a conversation in which Binance's chief compliance officer

4    warned Mr. Zhao that there were users from sanctioned countries on Binance.com, *see* Sentencing

5    Recommendation, at 6, the reality is that Binance, as a non-U.S. company, was not prohibited from

6    having users from U.S.-sanctioned countries on its platform.  By contrast, the sanctions charge to

7    which the Company pleaded is a novel and narrow one (applied for the first time against Binance)

8    that an algorithmic matching engine violates U.S. sanctions law by randomly pairing users in

9    sanctioned countries with users in the United States.  These random, automated transactions

10   between U.S. users and counterparties in sanctioned countries accounted for a miniscule

11   percentage (0.00041%) of overall trading volume on Binance.  Given how incredibly rare they

12   were, it is inconceivable that Mr. Zhao acted knowingly and deliberately to bring them about.  In

13   fact, in the very same chat noted by Probation, when asked whether Binance would proceed to

14   block IP addresses from sanctioned countries, Mr. Zhao responded "yes, let's do it."  And as the

15   PSR notes, the government "has not offered specific instances of explicit or deliberate knowledge

16   or belief, by the defendant, that funds processed through his exchange were proceeds of unlawful

17   activity"—including as to any sanctions activity.  Addendum to the PSR, at 50.

18        Further, any argument premised on the notion that cryptocurrency (generally) or Binance

19   (in particular) might be used for illicit purposes is similarly insufficient.  There is ample research

20   that transactions involving illicit conduct represent only a small portion of the cryptocurrency

21   industry's total volume, and this holds true at Binance as well.[4]  Probabilistic reasoning from

22   _____

23   [4] For example, transactions involving illicit accounts represented just 0.15% of cryptocurrency transaction volume in
     2021; in fact, "illicit activity's share" of total volume "has never been lower."  Chainalysis Team, *Crypto Crime*

24   *Trends for 2022: Illicit Transaction Activity Reaches All-Time High in Value, All-Time Low in Share of All*
     *Cryptocurrency Activity*, CHAINALYSIS (Jan. 6, 2022), available at https://www.chainalysis.com/blog/2022-crypto-
     crime-report-introduction/; *see, e.g.*, Europol, Cryptocurrencies – Tracing the evolution of criminal financing,

25   Europol Spotlight Report series, Publications Office of the European Union, Luxembourg (2021) ("The overall
     number and value of cryptocurrency transactions related to criminal activities still represents only a limited share of

26   the criminal economy when compared to cash and other forms of transactions."); *see also* BAE Systems, *Follow the*

1  statistical anomalies is not a proper basis for applying an enhancement that requires specific

2  knowledge.

3      For all of these reasons, the illicit funds enhancement does not apply, and the advisory

4  Guideline range is 10 to 16 months.

5                    **III.    APPLICABLE LAW**

6      Mr. Zhao's sentence must be "sufficient, but not greater than necessary" to accomplish the

7  specified goals of sentencing.  18 U.S.C. § 3553(a)(1)-(2); *see Kimbrough v. U.S.*, 552 U.S. 85,

8  101 (2007).  The first step is the calculation of the advisory Guideline range, which should provide

9  the "starting point and the initial benchmark."  *Peugh v. U.S.*, 569 U.S. 530, 536 (2013) (quoting

10 *Gall v. U.S.*, 552 U.S. 38, 49 (2007)).  The court must then consider "the nature and circumstances

11 of the offense and the history and characteristics of the defendant" to make an "individualized

12 assessment" of an appropriate sentence under the statute.  18 U.S.C. § 3553(a)(1); *Gall*, 552 U.S.

13 at 50.  Critically, the sentencing court must also consider "the need to avoid unwarranted

14 sentencing disparities among defendants with similar records who have been found guilty of

15 similar conduct."  18 U.S.C. § 3553(a)(5)-(6).

16     A sentence of probation is appropriate for Mr. Zhao.  As discussed above, the advisory

17 Guideline range, properly calculated, is 10 to 16 months of imprisonment.  That is the starting

18 point for the Court's analysis.  From there, the Probation Office recommends that the Court vary

19 downward to impose a sentence of five months' imprisonment based on mitigating factors that

20 include Mr. Zhao's "lack of criminal history, his extraordinary acceptance of responsibility, the

21 collateral consequences of the prosecution, and the fact that he does not seem to be a continued

22 danger to the community," as well as the reality that Mr. Zhao "has already been in the United

23 States for a significant time, without his family and unable to leave, as he awaits sentencing."

24 Sentencing Recommendation, at 2, 7, 11.

25

26 *Money*, SWIFT (2020), available at https://www.swift.com/sites/default/files/files/swift_bae_report_Follow-The%20Money.pdf  ("Identified cases of laundering through cryptocurrencies remain relatively small compared to the volumes of cash laundered through traditional methods.").

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO                        8
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

Mr. Zhao thanks Probation for its thoughtful, diligent work in this case. He agrees that a downward variance is appropriate to reflect his status as a first-time, nonviolent offender; the lack of any meaningful risk of recidivism; the nature of the offense conduct; Mr. Zhao's personal history and characteristics, which include his devotion to his young family and extensive charitable works; his extraordinary acceptance of responsibility; the five and a half months he has already spent in the United States away from his home and family; and the additional time he would spend in the custody of Immigration & Customs Enforcement ("ICE") for removal proceedings following any period of incarceration. But Probation's recommendation does not adequately take into account three additional, critically important factors: (a) ███████████████████ ██████████████████████████████████████████████████████; (b) the lack of precedent for sentencing *any* similar defendant to incarceration; and (c) the more severe conditions of incarceration Mr. Zhao would face as compared to a similarly situated U.S. citizen, solely on account of his status as a non-citizen. These factors, on top of the other mitigating factors identified by the Probation Office, are grounds for the Court to vary downward to a sentence of probation.[5]

This is a high-profile case, to be sure. But Mr. Zhao is not a symbol. He is a devoted father, a philanthropist, ███████████. He has already shown remorse for his offense and, more importantly, has remediated. When this Court assesses Mr. Zhao fairly, as a person, and based solely on the facts of his case, it should conclude that the just and appropriate result is probation.

## IV.    MR. ZHAO SHOULD BE SENTENCED TO PROBATION

### A.    The Nature and Circumstances of the Offense

It is important to contextualize Mr. Zhao's acceptance of responsibility against what his charge includes and what it *does not* include. Mr. Zhao has been convicted *only* of an AML compliance failure. He has not pleaded guilty to—nor has the government alleged that he

---

[5] Even under the Guidelines, because Mr. Zhao's offense level of 12 places him at the lowest level of Zone C, a sentence of probation would require a variance of just a single offense level to 11, which is Zone B. *See* U.S.S.G. § 5B1.1. The factors above more than justify such a variance.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

9

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    committed—any crime involving money laundering, fraud, theft, market manipulation, or any

2    comparable form of unlawful conduct.  He has not defrauded any investors, and there has been no

3    misappropriation of any customer assets.  *See* Sentencing Recommendation, at 9 (noting that "in

4    contrast to other, recent prosecutions that involved cryptocurrency exchanges, the conduct at issue

5    here did not involve stealing, spending, or investing customers' money"); PSR ¶ 53 (noting

6    "[t]here are no identifiable victims in this case").

7    It is equally important to balance Mr. Zhao's offense against his efforts—imperfect as they

8    were—to build a compliance program at Binance in an evolving regulatory environment.  In its

9    sentencing recommendation, Probation highlighted a handful of communications from the relevant

10   period, including a chat from September 2019 in which Mr. Zhao wrote: "If we blocked US users

11   from day 1, Binance will not [sic] as big as we are today.  We would also not have had any US

12   revenue we had for the last 2 years.  And further, we would not have had additional revenue

13   resulted from the network effect . . . better to ask for forgiveness than permission" in what Mr.

14   Zhao described as a "grey zone."  Sentencing Recommendation, at 5.  Even so, despite a lack of

15   "definite information" concerning the U.S. regulatory regime in 2019, Mr. Zhao stressed at the

16   time that Binance should "proactively" block U.S. users rather than "wait for the U.S. regulators

17   to come to us," noting that he wanted to "minimize the impact and keep the business to the extent

18   possible" while "being compliant."

19   Likewise, in February 2021, Mr. Zhao publicly stated that Binance "wanted to be compliant

20   everywhere we can."  And for the past several years, as set forth in detail in the PSR, *see* PSR ¶¶

21   48–50, and summarized in Section IV.C.2 below, Mr. Zhao and Binance have devoted enormous

22   resources to building an industry-leading compliance program.  The plea agreements and other

23   agency resolutions memorialize those measures and Binance's commitment to them, as well as the

24

25

26

1  government's compliance expectations,[6] providing for the first time a detailed roadmap and model

2  for others in this global industry.



[6] *See U.S. v. Binance Holdings Ltd,* No. 23-cr-178 (W.D. Wash. 2024), Dkt. 31, at 7; Dkt. 23, at 8-10; FinCEN Consent Order, at 4-7 (Nov. 21, 2023), available at https://www.fincen.gov/sites/default/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf; OFAC Settlement Agreement, at 6-9 (Nov. 21, 2023), available at https://ofac.treasury.gov/media/932356/download?inline; *CFTC v. Changpeng Zhao, et al.,* No. 23-cv-1887 (N.D. Ill. 2024), Dkt. 83, at 20-22.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

11

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200



SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

12

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200



SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

13

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200



### C.    Mr. Zhao's Personal History and Circumstances Support Lenience

Mr. Zhao is a forty-seven-year-old first-time offender.  His life has been built on three pillars: devotion to his family, developing technology (and especially Binance) as a force for positive change in the world, and serving the greater good.

#### 1.    Mr. Zhao's Devotion to His Family

Family is, and always has been, Mr. Zhao's highest priority.  He was born in a rural village in China's Jiangsu province, where his mother worked as a teacher and his father maintained the electrical network for the village's loudspeaker system.  When Mr. Zhao was twelve, the family emigrated to Vancouver, Canada, in the wake of the Tiananmen Square massacre.  PSR ¶¶ 83-84.  After arriving in Canada, Mr. Zhao's mother worked at a clothing factory, and his older sister soon began working as a cashier at McDonald's.  While his father pursued a degree, Mr. Zhao took any position he could to help his family.[8]  He began working at McDonald's with his sister when he was 14, and later took on other part-time jobs as a teenager, including as a dishwasher at a local

---

[8] *Who is Binance founder Changpeng 'CZ' Zhao, the billionaire who wants to 'rebuild' crypto?*, CNN (Nov. 15, 2022), available at https://www.cnn.com/2022/11/15/business/binance-founder-changpeng-zhao-ftx-intl-hnk/index.html.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

14

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    amusement park, a night shift clerk at a gas station, and a referee at volleyball games.  PSR ¶¶ 88-

2    89.

3         In 2003, Mr. Zhao married his then-partner, Weiqing (Winnie) Yang, and the couple soon

4    welcomed two children, a son and a daughter.  Friends who knew Mr. Zhao during this time recall

5    that he was a "dedicated husband and father."  Ex. B (B-9), Ltr. from J. and T. Tsai, at 2.  Ms.

6    Yang describes how "he has taken the greatest care of [her] and [their] children."  Ex. B (A-5),

7    Ltr. from W. Yang, at 2.  She continues: "I still clearly remember that during the infancy and early

8    childhood of our children after they were born, [Mr. Zhao] tried his best to be with our children as

9    much as he could and rarely missed any chances to personally take care of the children, such as

10   changing diapers, feeding milk, [and] traveling with [them]."  Ex. B (A-5), Ltr. from W. Yang, at

11   2.  Mr. Zhao's commitment to his children endured as they grew older, even after he and Ms. Yang

12   separated.  His eldest daughter notes that her father's "unwavering commitment to [her] wellbeing

13   was very evident through his advices and encouragement," even when they were apart from one

14   another.  Ex. B (A-3), Ltr. from R. Zhao, at 2.  She and Mr. Zhao's eldest son cherished their

15   father's "unconditional love" and "guidance."  Ex. B (A-3), Ltr. from R. Zhao, at 1; Ex. B (A-4),

16   Ltr. from R. Zhao, at 1.

17        In 2019, Mr. Zhao and his current partner, Ying (Yi) He, welcomed their first child.  Two

18   more children soon followed.  Even at the height of his entrepreneurial success, Mr. Zhao's family

19   remained the foundation of his life.  In 2021, when the crypto market and trading volumes were at

20   record highs, a friend visited Mr. Zhao's and Ms. He's three-bedroom apartment in Singapore

21   where "[m]ost of the living area was covered with play mats for his children with toys scattered

22   all around," and recalls that as Mr. Zhao's young son was playing, "he would turn to his father

23   every few minutes like clockwork to get a reassuring nod of approval."  Ex. B (C-7), Ltr. from R.

24   Teo, at 2, 4.  Mr. Zhao's three young children with Ms. He, including the couple's nine-month-old

25   baby, live in the UAE.  PSR ¶ 117.  Mr. Zhao has not seen them since traveling to the United States

26   to plead guilty, and he misses them dearly.  He has missed half of his youngest child's life,

including many "firsts."  As a loving and present father, this extended period of separation from his young children has, in its own way, already been a part of Mr. Zhao's sentence.

### 2. Mr. Zhao Built Binance as a Force for Positive Change

#### (a) The Vision Behind Binance

Mr. Zhao was an early cryptocurrency adopter because "he believed, and continues to believe, that this technology will transform the world."  PSR ¶ 103.  Mr. Zhao's interest was driven by the "inclusiveness and equal opportunity [cryptocurrency] provides to everyone in the world."  Ex. A, Ltr. from C. Zhao to Judge Jones, at 2.  He truly "believed . . . that this technology would help the underprivileged and the oppressed."  Ex. B (B-10), Ltr. from P. Wang, at 1.  A friend recalls that Mr. Zhao aimed to "build a world-changing company that focused on financial trust and security," and "wanted to devote the next chapter of his career to [cryptocurrency] and its capacity to reshape society for good."  Ex. B (B-1), Ltr. from R. Cao, at 1.  His hope was, and remains, "to use technology to advance the world."  Ex. B (A-2), Ltr. from Y. He, at  5.

In March 2017, Mr. Zhao began to develop the idea that would eventually become Binance.  The goal from the outset was to develop a streamlined cryptocurrency exchange that could provide a "more frictionless user experience" without sacrificing stability and security, and to make that technology available to everyone, including people in underdeveloped countries without access to a traditional, reliable banking system.[9]

In June 2017, Mr. Zhao and his colleagues—who had significant engineering, technology, and product development experience, but little to no background in U.S. regulation or compliance—launched Binance from Shanghai.  PSR ¶ 108.  The Company was founded with the core mission to "spread the freedom" of money around the globe while protecting user funds through platform stability and technical security.[10]  As Mr. Zhao's sister describes it, there were

---

[9] *Who Is Guangying Chen, and Is Binance a "Chinese Company"?*, BINANCE (Sept. 1, 2022), available at https://www.binance.com/en/blog/from-our-ceo/who-is-guangying-chen-and-is-binance-a-chinese-company-2386330931319516973.

[10] *The Meteoric Rise of Crypto Exchange Binance,* EPICENTER (May 16, 2018), available at https://epicenter.tv/episodes/235/.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

16

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    "two main consideration points in every discussion" in early meetings at Binance: "keeping

2    customer funds safe, and what makes the best service." Ex. B (A-1), Ltr. from J. Zhao, at 1-2.

3        When it first launched, Binance was a small startup, with a small team of about thirty

4    people, that provided only crypto-to-crypto spot exchange services (in other words, exchanging

5    one cryptocurrency for another). This time in Mr. Zhao's life was "very hectic" and the "highest

6    pressure period in his life, apart from his current circumstances." PSR ¶¶ 108-09. He recalls a

7    total lack of sleep and losing 15 pounds in a month. PSR ¶ 109. Through hard work, the exchange

8    grew exponentially; within the first three months, Binance reported a daily transaction volume of

9    $500 million. PSR ¶ 111.

10       Yet the exchange almost died in its earliest days when, in September 2017, the Chinese

11   government banned all crypto exchanges from operating in China. Mr. Zhao was once again

12   forced to abandon his life in China, approximately 30 years after his parents fled from persecution

13   during the Cultural Revolution. And because many of the projects that had tokens on Binance did

14   not have funds to repay their investors, Mr. Zhao agreed to cover those costs for all mainland users

15   despite the fact that doing so required 40% of all of Binance's own assets. PSR ¶ 112. It was of

16   paramount importance to Mr. Zhao to guarantee the safety of users, a tenet that continues to be a

17   chief operating principle of Binance today. Ex. B (D-25), Ltr. from J. Jakubcek, at 2.

18       The Company and its approximately 30 employees uprooted from their base and moved to

19   Tokyo a few months after launch. PSR ¶ 113. Although most exchanges concentrated exclusively

20   on developed countries to maximize revenues, Mr. Zhao's focus included reducing financial

21   inequalities globally and investing heavily in developing countries in Africa, Asia, and South

22   America. *See, e.g.*, Ex. B (E-3), Ltr. from R. Bibi, at 2.[11] Binance has positively influenced

23   millions globally and allowed countless unbanked individuals to participate in a transformative

24   financial revolution. Ex. B (F-8), Ltr. from H. Mokhtafa, at 2. As one blockchain entrepreneur

25

26   [11] Among the hundreds of letters of support submitted for Mr. Zhao, there are numerous letters from individuals
     around the world that attest to this focus and the value that Binance and Mr. Zhao have provided to them. *See
     generally* Ex. B.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)                17

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

writes, Mr. Zhao's "leadership transformed Binance into a cradle of innovation, opening the world of digital economy to millions," and "[h]is dedication to demystifying cryptocurrency has shattered barriers, bringing financial empowerment to those sidelined by traditional systems."  Ex. B (G-8), Ltr. from M. Guan, at 1.

### (b)    Binance's Early Days and Compliance Efforts

Binance continued to grow at an unexpected and difficult-to-manage pace.  An additional "couple of million" users joined every week; at one point in early 2018, 240,000 people signed up in a single hour.[12]  This growth occurred against a backdrop of an uncertain and evolving regulatory environment.  As the user base continued to grow around the world, governments struggled (and continue to struggle) to settle on the proper approach to regulate this new technology.[13]  Particularly in its early, rapid-growth phase, Binance also had to contend with a host of evolving and complex technological challenges.

It was in this environment that Mr. Zhao and Binance, regrettably, prioritized growth over compliance with the U.S. regulatory requirement at issue.  Mr. Zhao was aware that U.S. users were on the platform, but "failed to appreciate the magnitude" of that fact.  PSR ¶ 118.  Today, of course, Mr. Zhao "recognizes that he could have, and should have, done a better job" implementing a U.S.-compliant AML program, or more quickly facilitating the transition of U.S. users off of the global exchange when it did not have an AML program in place that complied with U.S. law.  PSR ¶ 118.  Mr. Zhao acknowledges and accepts responsibility for that failing.

---

[12] *World's top-ranked crypto venue added 240,000 users in one hour,* Mint (Jan. 11, 2018), available at https://www.livemint.com/Money/YFEjhxueIYQlCcHIHFMZXP/Worlds-topranked-crypto-venue-added-240000-users-in-one-h.html.

[13] *See, e.g., Embracing Collaboration over Isolation: Navigating The Shift In Global Cryptocurrency Regulations,* Forbes (Oct. 8, 2023), available at https://www.forbes.com/sites/digital-assets/2023/10/08/embracing-collaboration-over-isolation-navigating-the-shift-in-global-cryptocurrency-regulations/?sh=13f1efa2298f  *The Right Rules Could Provide a Safe Space For Innovation,* International Monetary Fund (September 2022), available at https://www.imf.org/en/Publications/fandd/issues/2022/09/Regulating-crypto-Narain-Moretti; *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets,* GAO (last visited Mar. 25, 2024), available at https://www.gao.gov/products/gao-23-105346.

1    He did not fail to act entirely, however. Quite the contrary: Mr. Zhao worked to hire
2  compliance personnel with experience in U.S. law and compliance, and in mid-2019 he launched
3  Binance.US, a separate, U.S.-based version of the exchange that was compliant with U.S. AML
4  requirements. And although Binance's global efforts fell short of the U.S. requirements, during
5  this time the Company worked diligently to secure regulatory licenses from more than a dozen
6  countries across the world,[14] demonstrating a respect for and engagement with regulatory
7  processes that continues today. This came with much higher regulatory costs, but Mr. Zhao "was
8  willing to accept lower financial returns and a competitive disadvantage in exchange for showing
9  the world that Binance and cryptocurrencies can and should [abide by] rules and regulations." Ex.
10 B (D-17), Ltr. from N. Fuwattananukul, at 2.

11    The General Manager for Binance in Thailand echoes that Mr. Zhao "understood that for
12 this cryptocurrency industry to grow, it had to be regulated in order to become legitimate and
13 accepted by the wider population and not some new elusive technology that was outside the law."
14 Ex. B (D-17), Ltr. from N. Fuwattananukul, at 2. Over the course of 2021 and 2022, Binance
15 worked with specialized third parties to support its compliance programs and spent more than $80
16 million on compliance-related vendors. Additionally, Binance implemented a number of AML
17 programs, enhanced its due diligence of platform users, established a comprehensive sanctions
18 policy and conducted a lookback to identify sanctioned users, created a quality assurance team to
19 assess whether KYC and customer due diligence measures were being implemented consistently
20 and accurately, updated AML training for employees, and tightened its controls to prevent U.S.
21 users from accessing its platform. PSR ¶ 48. As noted above, the DOJ and other government
22 agencies have recognized these measures and the Company's continuous efforts to enhance its
23 compliance program. *See supra*, at Section I.B. The result, as CEO of Binance France SAS, David
24 Princay, notes, is that Mr. Zhao "has consistently focused on adapting strategies to meet regulatory

25
26 [14] *Binance*, No. 23-cr-178, Dkt. 33 at 5 ("Among other things, the government well knows that in the years leading up to this resolution, BHL and its sister corporate entities had obtained licenses in more than a dozen foreign jurisdictions.").

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

19

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1 requirements, positioning Binance as the first global exchange to be regulated." Ex. B (D-48), Ltr.

2 from D. Princay, at 1.

3      As described by Tigran Gambaryan, Binance's Head of Financial Crime Compliance—

4 who joined Binance in September 2021, after serving for ten years as a Special Agent at the Internal

5 Revenue Service ("IRS") focusing on significant cryptocurrency cases—it is clear that with

6 Binance's compliance program, Mr. Zhao sought "not just oversight," but "to raise Binance's

7 compliance to a standard of excellence." Ex. B (D-18), Ltr. from T. Gambaryan, at 2.  Indeed, Mr.

8 Zhao personally chose Mr. Gambaryan to lead Binance's investigations team to ensure exemplary

9 service to law enforcement and a secure, compliant cryptocurrency ecosystem.  Ex. B (D-25), Ltr.

10 from J. Jakubcek, at 2.  Ultimately, while Mr. Zhao and Binance did not move swiftly enough with

11 respect to U.S. BSA requirements, the compliance enhancements implemented under Mr. Zhao's

12 leadership have resulted in Binance's best-in-class AML/KYC program today.  *See* PSR ¶¶ 48-52.

13           **(c)      Mr. Zhao and Binance as Forces for Good in Cryptocurrency**

14      As the regulatory landscape for digital assets has evolved in recent years, Mr. Zhao has

15 continued to push Binance toward being the industry leader on compliance and regulation.  And

16 as Binance has built a best-in-class compliance program, it has grown to be a trusted partner and

17 resource for law enforcement worldwide.  Since the early days of the Company, Mr. Zhao has

18 "personally pushed for the exchange to work closely with the international law enforcement

19 community, resulting in much higher compliance costs."  Ex. B (D-25), Ltr. from J. Jakubcek, at

20 1.  His leadership has been pivotal for Binance's ability to collaborate with government agencies,

21 including his decision to implement global KYC requirements for all users—a process

22 implemented in full in 2022, making Binance one of the first international cryptocurrency

23 exchanges to do so and its program the most comprehensive.  One result of that decision is that

24 Binance now has one of the richest sources of digital transaction data in the world, with each

25 account tied to an identifiable user who has undergone KYC—an invaluable resource to law

26

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)                    20

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1   enforcement.  This is in stark contrast to other international cryptocurrency exchanges, many of

2   whom require KYC on only a subset of customers or not at all.

3       Law enforcement has benefited, and continues to benefit, greatly from Binance's data and

4   assistance.  Mr. Zhao was the impetus for Binance's proprietary Law Enforcement Request

5   System, announced in 2021, which provided a platform where law enforcement officials and other

6   government agents could make and track formal electronic requests of the Company and ongoing

7   investigative assistance.[15]  In 2021, Binance received a total of 19,879 requests for assistance or

8   information from law enforcement.  In 2022, that number skyrocketed to 58,507.  And last year,

9   Binance received more than 60,000 requests, with 9,390 originating from law enforcement

10  officials in the United States.  PSR ¶ 49.  This extensive support from the Company at Mr. Zhao's

11  direction has led to seizures of hundreds of millions of dollars.  In 2023 alone, Binance assisted

12  law enforcement with the seizure of more than $400 million—and of that total, more than $350

13  million were seizures processed by Binance on behalf of U.S. authorities.  PSR ¶ 51.  To state the

14  obvious, a company (or CEO) that disregards compliance or U.S. law entirely would not take these

15  steps.

16      In addition, over several years, the Company has significantly invested in its legal and

17  compliance teams by hiring hundreds of specialists, "including former law enforcement officers,

18  federal prosecutors, regulators, cryptocurrency and fintech compliance experts, and banking

19  compliance professionals."  PSR ¶¶ 49-50.  These teams have worked to build both "proactive and

20  reactive systems" to assist and support law enforcement worldwide.  PSR ¶ 50.  "Binance has

21  always been one of the most responsive exchanges and one that has provided investigators and

22  prosecutors with more practical information than other exchanges, going far beyond the required

23  degree of cooperation."  Ex. B (D-25), Ltr. from J. Jakubcek, at 1.

24

25

26  [15] *Hear from CZ: Our Approach To User Protection and Proactive Compliance*, Binance Blog (Sept. 24, 2021), available at https://www.binance.com/en/blog/from-our-ceo/hear-from-cz-our-approach-to-user-protection-and-proactive-compliance-421499824684902811.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

21

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    Mr. Zhao's and Binance's collaboration with law enforcement has specifically sought to

2    address the threat of terrorism across the globe.  In 2023, Binance collaborated with law

3    enforcement agencies from 48 countries, including the United States, relating to ongoing terrorism

4    investigations.  Notably, a substantial amount of this collaboration was proactively initiated by

5    Binance's in-house investigations team, resulting in the identification and referral to law

6    enforcement of more than 2,157 on-chain cryptocurrency addresses suspected of association with

7    terrorist-financing activities.  As a result, and in partnership with the appropriate law enforcement

8    entities, Binance has taken action against financing operations associated with radical terrorist

9    groups, including Hamas, Al-Qaeda, ISIS, and Hezbollah.

10    Beyond disrupting potential financing of terrorism, the Company's assistance has also

11    provided the information and evidence necessary for the United States and other governments to

12    bring bad actors to justice.  Mr. Zhao is committed to "work[ing] with regulators . . . on a global

13    scale, in a way that [is] fully transparent and secure."  Ex. B (D-50), Ltr. from V. Sacheendran, at

14    1. ███████████████████████████████████████████████████████████████████

15    ████████████████████████████████████████████████████████████████████████

16    ████████████████████████████████████████████████████████████████████████

17    ████████████████████████████████████████████  And the Company has been

18    instrumental in counteracting other major high-risk entities, including the sanctioned Russia-based

19    entity, Suex OTC.[16]  As Mr. Gambaryan writes: "Our collective success, which now includes

20    supporting victims of kidnapping and disrupting terrorist financing, is a testament to [Mr. Zhao]'s

21    investment in our mission."  Ex. B (D-18), Ltr. from T. Gambaryan, at 2.

22    Mr. Zhao and Binance have also prioritized the formation of programs designed to provide

23    training and assistance to international law enforcement authorities.  For example, in 2022 (long

24    before his guilty plea), Mr. Zhao directed the Company to establish a Global Law Enforcement

25

26    ───────────────
[16] *Innovation, Regulation, & the Future of the Crypto Industry*, BINANCE (Sept. 22, 2021), available at
https://www.binance.com/en/blog/ecosystem/innovation-regulation-and-the-future-of-the-crypto-industry-421499824684902798.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

22

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

Training Program aimed at assisting law enforcement in detecting financial and cyber-crimes.[17] In 2022 and 2023 alone, the program hosted over 180 anti-cybercrime workshops and training sessions with members of global law enforcement agencies across Asia, Europe, and the Americas.[18] "Despite the cost implications that would dissuade any other exchange CEO, [Mr. Zhao] has, like in many other circumstances, decided to push for the positive impact, encouraging practical education." Ex. B (D-25), Ltr. from J. Jakubcek, at 2.

Under Mr. Zhao's leadership, Binance has built close working relationships with the U.S. Director of National Intelligence's National Counterterrorism Center; the Department of Defense; the Federal Bureau of Investigation's ("FBI") Counterterrorism Division; and the Department of Homeland Security, among many others. The Company frequently receives messages of gratitude and appreciation from its partners in law enforcement, both for assisting in specific cases as well as for the numerous training programs the Binance team offers to law enforcement personnel worldwide. For example, one 2023 email from a Colorado Chief Deputy District Attorney described how, "[o]n incredibly short notice," Binance flew in a team member to testify in the first cryptocurrency case in Colorado, testimony that the government attorney emphasized "saved our entire case." The District Attorney went on to write that "without your help and [the Binance witness]'s willingness to come save us, we would not have been able to admit the records. . . . I would love to have an opportunity to debrief with your team about what I learned during these cases and what issues we had." Email from Co. Chief Deputy Dist. Att'y, at 1-2. A similar email from the FBI touts the Company's expeditious response to law enforcement, stating "[t]he company has the quickest response time out of any company I have subpoenaed in my 13+ years

---

[17] CZ, *Introducing #Binance's Global Law Enforcement Training Program. This is a first for the industry. The program is designed to help law enforcement detect financial and cyber crimes and assist in the prosecution of bad actors who exploit digital assets.*, Twitter (Sept. 27, 2022), available at https://twitter.com/cz_binance/status/1574793357636898816.

[18] *Inside Binance's Fight Against Crypto Crime*, Binance Blog (Dec. 12, 2022), available at https://www.binance.com/en/blog/leadership/inside-binances-fight-against-crypto-crime-5422427314690193337; *Binance Shares Cyber-Policing And Investigative Expertise with INTERPOL*, Binance Blog (Feb. 9, 2024), available at https://www.binance.com/en/blog/ecosystem/binance-shares-cyberpolicing-and-investigative-expertise-with-interpol-8801759366914474386.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

23

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

in law enforcement." Email from FBI Austin, at 1. And the European Commission expressed its appreciation for the Company's presentation on countering terrorism financing by stating in a letter that "[Binance's] willingness to engage in meaningful dialogue and address questions from the participants demonstrated your dedication to fostering a deeper understanding of the possibilities and solutions available to counter terrorism financing." Letter from European Commission, at 1.

Most recently, at the Blockchain Association Policy Summit on November 29-30, 2023, a panel on cryptocurrency and U.S. national security consisting of representatives from FinCEN, DOJ, and the FBI discussed Binance's November 21 resolutions. In that conversation, an attorney with the DOJ's Computer Crime and Intellectual Property Section stated: "Contrary to probably what the general public might think, over the last couple of years Binance has been very responsive to law enforcement. . . . They do have one of the best analysts on their team that knows everything about North Korean cyber hacks and North Korean money laundering and works [] pretty closely with the FBI and IRS on some of these cases."[19]

This on-the-ground, real-world statement of the U.S. law enforcement community's appreciation for the support it receives from Mr. Zhao's Company stands in stark contrast to the highly politicized and sensational press statements that accompanied the announcement of Mr. Zhao's and the Company's pleas. Binance's longstanding commitment to supporting law enforcement across the globe in bringing bad actors to justice—a commitment founded, and a system built, at Mr. Zhao's direction—will continue into the future thanks to his dedicated efforts during his time at the Company's helm. Mr. Zhao's offense conduct in this case has to be viewed against this broader context of his and Binance's multi-year, concerted efforts to assist law enforcement and build the best-in-class compliance program the Company has today.

---

[19] *Global Crypto Networks and U.S. National Security*, Blockchain Association Policy Summit (Nov. 29-30, 2023), available at https://www.youtube.com/watch?app=desktop&v=rFXQ2pcFx8Q&feature=youtu.be.

### 3.    Mr. Zhao's Commitment to the Greater Good

Mr. Zhao has lived his life in service to the greater good.  "His dedication to family extends to his broader impact on society, as he treats colleagues and the community with the same care."  Ex. B (C-4), Ltr. from Shaikh A. Almualla, at 2.  Letters from family, friends, colleagues, and community members describe how Mr. Zhao's integrity, compassion, generosity, and "deep sense of accountability" have inspired and positively impacted those around him.  *See, e.g.*, Ex. B (A-4), Ltr. from R. Zhao, at 1; Ex. B (B-5), Ltr. from J. Hofbauer, at 2; Ex. B (D-1), Ltr. from S. Austin, at 2; Ex. B (E-30), Ltr. from Y. Xu, at 1.

Despite the distorted image painted by the government and the media, and in stark contrast to many of his counterparts in the crypto and financial services industries, Mr. Zhao is not driven by the meaningless pursuit of riches.  He is known by his friends and colleagues to be frugal and humble.  *See, e.g.*, Ex. B (D-12), Ltr. from B. Dasgin, at 2 ("[H]e lived by a minimalist philosophy, which inspired me to follow-suit.").  Mr. Zhao "knows nothing about the jewelry, luxury goods, luxury cars, and art auctions that rich people are passionate about," and he does not own luxury watches or cars (with the exception of a recently purchased Toyota minivan).  Ex. B (A-2), Ltr. from Y. He, at 7-8.  He prefers to use his resources to support his family and to "add[] something meaningful to the world," a tenet he learned from his father.  PSR ¶ 114.  Indeed, in 2021, Mr. Zhao publicly stated that he intends to give away 90% to 99% of his wealth.[20]

Mr. Zhao is steadfast in his dedication to the broader community and has made significant efforts to give back and assist those in need, both independently and via Binance's charitable initiatives.  Mr. Zhao's friend, Lily Dash, writes that Mr. Zhao's "generosity of spirit in those things big and small is significant."  Ex. B (B-3), Ltr. from L. Dash, at 2.  Ms. Dash, a native of Barbados, describes Mr. Zhao's significant contributions to the country and people of Barbados after learning about the high rates of non-communicable diseases in the country:

---

[20] Stan Choe, *Q & A: Binance CEO on Bubbles, Meme Coins and Crypto's Swings*, ASSOCIATED PRESS (Nov. 17, 2021), available at https://apnews.com/article/cryptocurrency-technology-business-bitcoin-862d03b59ab714e3230ce85ef8a7ed43.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

25

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1
2
3
4
5

> At the end of 2022[,] when [Mr. Zhao] became aware of the high rates of [non-communicable diseases] in Barbados after visiting the Island and requesting a briefing, he immediately made a significant multi-year social impact investment to establish charitable private clinics to provide affordable and accessible medical care to the less fortunate. This social impact investment has already made a difference in the lives of a growing number of vulnerable Barbadians and will continue to do so into the future as it bridges the gap between government welfare and private health care for those who are not well off.

6    Ex. B (B-3), Ltr. from L. Dash, at 2.

7    Recently, Mr. Zhao launched his next charitable endeavor, Giggle Academy: a free

8    educational platform with the mission to make "basic education accessible, addictive and adaptive,

9    to the kids who don't have access to [it] today, all around the world, for free."[21]  The project aims

10   to capitalize on Mr. Zhao's experience and expertise building software platforms to reach hundreds

11   of millions of children while partnering with education professionals to design and provide content

12   appropriate for children of all ages.[22]  This new initiative is further evidence of his lifelong

13   commitment to helping disadvantaged communities by creating opportunities to learn and grow

14   without the barriers of traditional systems.[23]

15   In addition to Mr. Zhao's personal philanthropic efforts, Binance, at his direction,

16   established a dedicated charitable giving arm in 2018.  Since its founding, Binance Charity, which

17   is engaged in extensive charitable efforts globally, has helped more than 3.5 million people in more

18   than 60 countries by committing more than $31 million to fund 42 projects.[24]  *See* PSR ¶ 115.  In

19   particular, Binance is committed to providing global humanitarian aid to vulnerable populations

20   and to supporting accessible education and financial literacy—two causes that are deeply

21   important to Mr. Zhao.

22
23

---

24   [21] *Concept Brainstorm,* Giggle Academy (Feb. 2024), available at
     https://www.giggleacademy.com/Giggle%20Academy%20v0.4%2020240221.pdf.

25   [22] *Id.*

26   [23] *Id.*

[24] *Impact*, Binance Charity (last visited Apr. 19, 2024), available at https://www.binance.charity/impact.

SENTENCING MEMORANDUM ON BEHALF                    LATHAM & WATKINS LLP
OF DEFENDANT CHANGPENG ZHAO                         1271 Avenue of the Americas, New York, NY 10020
(*United States v. Changpeng Zhao*, CR23-179-RAJ)    26    (212) 906-1200

1    ***Humanitarian Aid.***  As evidenced by many of the letters supporting Mr. Zhao, he is

2    committed to swiftly assisting populations in times of need.  *See, e.g.*, Ex. B (D-18), Ltr. from T.

3    Gambaryan, at 3 ("In times of conflict and natural disasters, [Mr. Zhao] has been a beacon of

4    support for our employees.  His response to the crises in war-affected regions has been nothing

5    short of extraordinary."); Ex. B (D-31), Ltr. from V. Krishnamoorthy, at 1 (noting Mr. Zhao's and

6    Binance's impactful donations to causes including COVID-19 aid, Morocco earthquake disaster

7    relief, and Ukraine emergency relief); Ex. B (D-68), Ltr. from T. Zhou, at 1-2 ("In times of global

8    crises, [Mr. Zhao] is always the first to send internal messages, launch programs, and encourage

9    teams to support those in need, reflecting a genuine commitment to giving back to the community

10   and aiding those in desperate circumstances.").

11           Under Mr. Zhao's leadership, Binance Charity has pledged millions of dollars to assist

12   individuals impacted by natural disasters worldwide, including devastating earthquakes in Turkey

13   and Morocco, floods in Libya and Italy, and Hurricane Otis in Mexico.[25]  In France, Binance

14   Charity has "contributed to the renovation of Notre-Dame [and] supported local communities with

15   Les Restos Du Coeur."  Ex. B (D-48), Ltr. from D. Princay, at 1.  In addition, Binance not only

16   committed $10 million in immediate aid to Ukrainian refugees, but also launched initiatives to

17   provide longer-term financial support to Ukrainian refugees and internally displaced people.[26]

18   And during the height of the COVID-19 global pandemic, Mr. Zhao directed Binance to fund

19   United Nations COVID-19 vaccination efforts and engage in efforts to deliver personal protective

20   equipment to vulnerable populations in areas hit hardest by the virus.[27]  *See* PSR ¶ 116.  Binance

21   Charity launched a "Crypto Against COVID campaign that collected the equivalent of  $4 million

22   in cryptocurrenc[y], which provided assistance to more than 1 million end-beneficiaries in 26

---

24   [25] *Crypto for Good: A Year of Giving Back*, Binance Charity (Nov. 28, 2023), available at
     https://www.binance.charity/posts/103/Crypto-for-Good--A-Year-of-Giving-Back.

25   [26] *Humanity First: Update on Ukraine Efforts*, Binance Charity (Mar. 14, 2022), available at
     https://www.binance.charity/posts/42/Humanity-First--Update-on-Ukraine-Efforts-.

26   [27] *Crypto Against COVID update - thank you for your support*, Binance Charity (Aug. 6, 2021), available at
     https://www.binance.charity/posts/18/Crypto-Against-COVID-update---thank-you-for-your-support.

1   countries.     Binance Charity gave 100% of the donations to the end-beneficiaries and -

2   organizations."  Ex. B (D-16), Ltr. from M. Fujimoto, at 6.

3        ***Education Initiatives.***   Mr. Zhao is also passionate about empowering and supporting

4   underrepresented populations to gain financial literacy and access to blockchain education.  Under

5   Mr. Zhao's direction, Binance has donated more than $5.5 million, and raised an additional $7

6   million from donors, for various education initiatives via its Web3 Education For All Program,

7   which is aimed at empowering underrepresented and underprivileged individuals and increasing

8   financial inclusion.[28]  *See* PSR ¶ 116.  These initiatives have included scholarships for children in

9   Africa in a one-year intensive skill training program;[29] free training for students, with a focus on

10  women, in partnership with the Frankfurt School of Finance & Management – Blockchain Center

11  to support crypto education and job creation in Germany;[30] blockchain educational courses for

12  2,800 women from vulnerable communities across Brazil and Africa;[31] and $1 million in donations

13  to provide at least 1,000 Ukrainians with full scholarships to study in technology-related roles and

14  secure technical jobs.[32]  One beneficiary of Mr. Zhao's and Binance's educational initiatives writes

15  that "[Mr. Zhao's] commitment to education is not confined to [her] story alone.  His efforts extend

16

17

18  [28] *Web3 Education for All*, Binance Charity (last visited Apr. 19, 2024), available at
19  https://www.binance.charity/projects/39/Web3-Education-for-All.

20  [29] *Binance Charity Partners with Utiva to Educate 50,000 Youths and Provide Tech Training/Scholarships to Over 1,000 Youth Across Africa*, Binance Charity (Oct. 24, 2022), available at https://www.binance.charity/posts/72/
21  Binance-Charity-Partners-with-Utiva-to-Educate-50-000-Youths-and-Provide-Tech-Training-Scholarships-to-Over-1-000-Youth-Across-Africa.

22  [30] *Binance Charity Announces Education Initiative with Frankfurt School's Blockchain Center to Increase Access to Web3 Education for All*, Binance Charity (Oct. 18, 2022), available at https://www.binance.charity/posts/71/
23  Binance-Charity-Announces-Education-Initiative-with-Frankfurt-School-s-Blockchain-Center-to-Increase-Access-to-Web3-Education-for-All.

24  [31] *Binance Charity and Academy partners with Women in Tech to Offer Free Blockchain Courses for Rural Communities*, Binance Charity (Sept. 1, 2022), available at https://www.binance.charity/posts/66/Binance-Charity-
25  and-Academy-partners-with-Women-in-Tech-to-Offer-Free-Blockchain-Courses-for-Rural-Communities-.

26  [32] *Binance Charity Donates $1 Million BUSD to launch educational project for Ukrainians*, Binance Charity (June 29, 2022), available at https://www.binance.charity/posts/63/Binance-Charity-Donates--1-Million-BUSD-to-launch-educational-project-for-Ukrainians.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

28

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

globally, sustaining schools in Africa and providing countless individuals with the chance to build a better future.  This dedication speaks volumes about his character and the values he upholds."  Ex. B (F-4), Ltr. from S. Goncalves da Silva, at 1-2.

Mr. Zhao also directed Binance to create initiatives that support greater access to education for underprivileged children more broadly.  For example, Binance's Lunch for Children program has provided nutritious meals to thousands of children across Africa.[33]  In addition, the Binance for Children program has donated textbooks and school materials for children in Uganda whose parents cannot afford them, along with providing electricity with clean and safe solar energy to vulnerable communities.[34]

As evidenced by these endeavors and the more than 160 letters submitted in his support (including one letter co-signed by more than 50 people, Ex. B (D-28), Ltr. from K. Khomiakov), Mr. Zhao cares deeply for his loved ones and community members alike.  As his friend, Anndy Lian, writes, Mr. Zhao's "unwavering commitment to making a tangible difference in communities globally has been a source of inspiration and motivation."  Ex. B (E-15), Ltr. from A. Lian, at 1.  In that spirit, Mr. Zhao remains committed to serving as a force for good for the community.

In looking forward to the future, Mr. Zhao is committed to ongoing charitable work.  He has particularly "taken up active interests in learning to apply his technology insights and computer science knowhow to help drive progress in biotechnology[.]"  Ex. B (B-9), Ltr. from J. and T. Tsai, at 2.  To him, crypto and biotech carry a similar promise, one that has long appealed to his character: the potential to make expensive, exclusive, life-changing technology available to the broader population.  Ex. A, C. Zhao Ltr. to Court, at 2.  Mr. Zhao is interested in exploring ways that he can leverage his skills and resources to promote research and increase access to clinical

---

[33] *Binance Lunch for Children*, Binance Charity (last visited Apr. 19, 2024), available at https://www.binance.charity/projects/5/Binance-Lunch-for-Children.

[34] *Binance for Children: Textbooks, Pencils, Rulers and other materials*, Binance Charity (last visited Apr. 19, 2024), available at https://www.binance.charity/projects/22/Binance-for-Children_Textbooks,-Pencils,-Rulers-and-other-materials; *Binance for Children_Solar Panels*, Binance Charity (last visited Apr. 19, 2024), available at https://www.binance.charity/projects/20/Binance-for-Children_Solar-Panels.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

29

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

trials for complex diseases.  Ex. A, C. Zhao Ltr. to Court, at 2.  Mr. Zhao is also interested in helping biotech companies to develop cures for devastating diseases that are not sufficiently widespread for larger biopharmaceutical companies to address.  Ex. A, C. Zhao Ltr. to Court, at 2.  As a friend and former colleague writes, Mr. Zhao "will seek to create value in other fields," including the biomedical industry, as Mr. Zhao "strongly believes that with the current technologies, humans should continually improve on coming up with even better solutions to more illnesses and diseases, so more people could have the opportunity to enjoy a better quality of life."  Ex. B (B-12), Ltr. from A. Yan, at 3.

### D.    Mr. Zhao Has Shown Extraordinary Acceptance of Responsibility

Mr. Zhao has exhibited what the Probation Office described as "remarkable" and "exceptional" acceptance of responsibility.  PSR ¶¶ 55, 156.  As described earlier, in addition to appearing voluntarily from a non-extradition country to plead guilty to a criminal charge, Mr. Zhao and the Company entered into a multi-agency resolution, pursuant to which Mr. Zhao and the Company agreed to pay an unprecedented fine of more than $4.3 billion, plus his personal fine of $150 million to the CFTC.  And he has stepped down as CEO of the company that he built from the ground up.  Mr. Zhao understands the gravity of his offense, regrets the choices he made, and wishes to move on to the next chapter of life, which includes philanthropic efforts and caring for his partner and young children, which he has not been able to do since arriving in the United States to plead guilty in November 2023.  As noted by his friend, Ms. Dash, Mr. Zhao's "absence has and would immeasurably affect the lives of his family, especially his very young children in Abu Dhabi, who still very much need him[,] and his [82-year-old] mother who relies on him."  Ex. B (B-3), Ltr. from L. Dash, at 2-3.

Those close to Mr. Zhao attest to his acknowledgment of his mistakes, as well as the "personal growth and remorse he has shown, especially in the face of adversity and under the scrutiny of his own family."  Ex. B (B-4), Ltr. from R. Gu, at 3; *see also* Ex. B (C-1), Ltr. from Amb. M. Baucus, at 1 (noting that Mr. Zhao is "one of the most decent persons I have known" and

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

30

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1  is "very contrite and assumed full responsibility").  Mr. Zhao has recognized how his "poor

2  decisions" and "choices" led him to this moment in his life, and the tremendous impact those

3  decisions and choices had on his family, friends, employees, and the cryptocurrency community.

4  Ex. A, Ltr. from C. Zhao, at 1, 2.  But those same decisions and choices have encouraged Mr. Zhao

5  to reflect on how he can positively affect the lives of others moving forward.  Ex. A, Ltr. from C.

6  Zhao, at 1, 2.  In Mr. Zhao's words, this "will be [his] only encounter with the criminal justice

7  system and . . . going forward [he] will live [his] life in a manner that will make everyone proud."

8  Ex. A, Ltr. from C. Zhao, at 2.  Mr. Zhao respectfully submits that an appropriate sentence should

9  reflect his character, his "remarkable" acceptance of responsibility, and his many contributions to

10  his family, friends, and community.

11        **E.**      **Precedent and the Need to Avoid Sentencing Disparities Warrant Probation**

12        The Court must impose a sentence that "avoid[s] unwarranted sentence disparities among

13  defendants with similar records who have been found guilty of similar conduct."  18 U.S.C.

14  § 3553(a)(6).  This factor strongly favors probation, as there are *no* similar defendants who have

15  been sentenced to a term of imprisonment.  With appreciation for the Probation Office's diligent

16  work in this case, the PSR does not fully address this critical factor.

17        By far, the most common outcome for a defendant convicted of a BSA or similar violation

18  is a sentence of probation or time served.  That is true in this District, *see, e.g.*, *U.S. v. Alshafei*,

19  No. 15-cr-34-RAJ (W.D. Wash. 2015) (defendant, facing a Guideline range of 15-21 months,

20  sentenced to time served for operating unlicensed money transmitting business), and nationally,

21  *see, e.g.*, *U.S. v. Koo*, No. 23-cr-00568 (C.D. Cal. 2024) (manager of investment firm sentenced to

22  probation for failure to maintain an AML program, including admitting to failing to file currency

23  transaction reports ("CTRs")); *U.S. v. Cohen*, No. 22-cr-265 (E.D. Pa. 2024) (owner of check-

24  cashing business sentenced to probation for failure to maintain an effective AML program,

25  conspiracy to file, and filing, false CTRs); *U.S. v. Ofer*, No. 21-cr-00174 (E.D.N.Y. 2023) (banker

26  sentenced to probation for failure to maintain effective AML program); *U.S. v. Gonzalez*, No. 21-

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

31

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

cr-1319 (S.D. Cal. 2022) (owner of currency exchange business that facilitated illegal cash transactions, including narcotics trafficking proceeds, sentenced to probation for failure to maintain an AML program, failure to disclose offices in Mexico, and filing false or materially misleading registrations and reports); *U.S. v. Fitch*, No. 16-cr-00123 (S.D. Cal. 2016) (money transmitter sentenced to probation for failure to maintain effective AML program); *U.S. v. Miller*, No. 13-cr-445 (E.D. Pa. 2014) (CEO of domestic financial institution sentenced to probation for failure to maintain an effective AML program and failure to file suspicious activity reports).[35]

The case most similar to this one is the recent BitMEX prosecution.  *See U.S. v. Hayes, et al.*, No. 20-cr-500 (S.D.N.Y. 2020).  There, three co-founders of a global crypto exchange (the CEO, Chief Operating Officer ("COO"), and Chief Technology Officer ("CTO")) each pleaded guilty, like Mr. Zhao, to a single count of causing their platform to fail to implement an effective AML program under the BSA.  As in its case against Binance, the government in *BitMEX* cited (i) a similar duration for the platform's violative conduct (five years); and (ii) billions of dollars in transaction volumes.[36]  Also like here, the government portrayed the conduct in stark and egregious terms, describing BitMEX as "in effect a money laundering platform" and "a vehicle for sanctions violations."[37]  The government also made more serious allegations not found here, including that the CEO and COO had personally "communicated directly with BitMEX customers who self-identified as being based in Iran."[38]

---

[35] The same can hold true for defendants in this District convicted of more serious crimes with higher Guideline ranges.  *See, e.g.*, *U.S. v. Lu*, No. 13-cr-15-RAJ (W.D. Wash. 2013) (sentencing defendant, convicted of wire fraud and facing a Guideline range of 15-21 months, to time served (satisfied by the surrender date) and supervised release); *U.S. v. Ulmer*, No. 15-cr-53-RAJ (W.D. Wash. 2015) (sentencing defendant convicted of bank fraud and facing a Guideline range of 12-18 months to time served (satisfied by the surrender date) and supervised release); *U.S. v. Shepard*, No. 18-cr-147-RAJ (W.D. Wash. 2018) (sentencing defendant, convicted of narcotic offenses, to time served (satisfied by the four days defendant was detained in between his arrest and detention hearing) and supervised release).

[36] *See Founders Of Cryptocurrency Exchange Plead Guilty To Bank Secrecy Act Violations*, DOJ Press Release (Feb. 24, 2022), available at https://www.justice.gov/usao-sdny/pr/founders-cryptocurrency-exchange-plead-guilty-bank-secrecy-act-violations; *U.S. v. Hayes*, No. 20-cr-500 (S.D.N.Y. 2020), Dkt. 2.

[37] *U.S. v. Hayes*, No. 20-cr-500 (S.D.N.Y. 2020), Dkt. 2 at ¶ 24.

[38] *Id.*

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

32

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

Even so, all three BitMEX founders were sentenced to probation. The BitMEX COO was sentenced to 30 months of probation and was allowed to travel and reside internationally both before and after his plea and sentencing.[39] The CTO, a U.S. citizen, was sentenced to 18 months of probation.[40] The CEO, who had a Guideline range of 6 to 12 months of imprisonment, was sentenced to two years of probation, with six months of home detention.[41] The BitMEX CEO was a U.S. citizen who was allowed to travel internationally on bail before sentencing,[42] whereas Mr. Zhao has been required to surrender his passports and remain in the United States away from home for five and a half months while awaiting sentencing. Notably, the BitMEX CEO faced arguments by the government that his sentence should reflect uncharged conduct covered in his plea agreement involving allegations of a series of false statements intended to mislead a bank over a multi-year period.[43] None of those factors exist here.

Furthermore, the BitMEX defendants were indicted and pleaded guilty only after 17 months of intense pre-trial litigation,[44] whereas Mr. Zhao pleaded guilty to an information, remediated, directed his Company to enter into a multi-agency resolution, and took numerous other steps to ensure compliance and cooperation. Given Mr. Zhao's extraordinary acceptance of responsibility, he should not be treated more harshly than the BitMEX founders; like them, he should receive probation.

In fact, even defendants with substantially *higher* Guideline ranges than Mr. Zhao have received sentences of probation for this type of BSA violation. For instance, in *U.S. v. Panzera*, No. 11-cr-591 (E.D.N.Y. 2014), the owner of a company involved in a fraudulent check-cashing scheme pleaded guilty—more than a year after indictment—both to failing to maintain an effective

---

[39] *See U.S. v. Delo*, No. 20-cr-500 (S.D.N.Y. 2022), Dkts. 33, 360, 380.

[40] *See U.S. v. Reed*, No. 20-cr-500 (S.D.N.Y. 2022), Dkt. 383.

[41] *See Hayes*, No. 20-cr-500, Dkt. 342, at 53; Dkt. 344.

[42] *See id.* at Dkt 47.

[43] *See id.* at Dkt. 334, at 6-7 and 12.

[44] *See, e.g., id.* at Dkt. 1; Minute Entry for Feb. 24, 2022.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

33

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

AML program and to conspiracy to defraud the United States under 18 U.S.C. § 371. His Guideline range was 24 to 30 months of imprisonment. Even with this higher Guideline range, plus the conspiracy offense that does not exist here, and the absence of unhesitating acceptance of responsibility like Mr. Zhao has shown, the court sentenced the defendant to three years of probation.[45]

Indeed, counsel is not aware of a single instance in which a first-time offender █████ ███████ who pleaded guilty to 31 U.S.C. §§ 5318(h) and 5322, and also did not engage in fraud, was sentenced to incarceration. To counsel's knowledge, there are only three cases—nationwide, ever—in which defendants convicted of this BSA offense were sentenced to prison. Each case is readily distinguished. *First*, in *U.S. v. Randol*, No. 23-cr-440 (C.D. Cal. 2024), the owner of a cryptocurrency-cash exchange business pleaded guilty to failing to maintain an effective AML program by "allowing his . . . company to help scammers and drug traffickers launder millions of dollars in criminal proceeds through his business."[46] The defendant "maintained a company website that falsely claimed his business was 'a fully compliant . . . money services business' that was registered with [FinCEN]," personally met with "anonymous customers in-person to complete transactions," "conducted hundreds of Bitcoin-for-cash transactions after receiving large cash shipments in the mail from anonymous individuals," and "t[ook] steps to conceal [unlawful transactions] from law enforcement."[47] The defendant also had a prior drug-related conviction and a long history of opioid abuse.[48] Facing a Guideline range of 6 to 12 months, the defendant was sentenced to four months of imprisonment. Plainly, the significant aggravating facts in *Randol* are *not* present in Mr. Zhao's case. ██████████

██████████████████████████████

---

[45] *U.S. v. Panzera*, No. 11-cr-591 (E.D.N.Y. 2014), Dkts. 21, 56, 100, 106.

[46] *Bitcoin-for-Cash Exchange Business Owner Agrees to Plead Guilty to Failing to Maintain an Effective Anti-Money Laundering Program*, DOJ Press Release (Sept. 5, 2023), available at https://www.justice.gov/usao-cdca/pr/bitcoin-cash-exchange-business-owner-agrees-plead-guilty-failing-maintain-effective.

[47] *Id.*

[48] *U. S. v. Randol*, No. 23-cr-440 (C.D. Cal. 2024), Dkt. 50, at 6, 12-14.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

34

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1      *Second*, in *U.S. v. G & A Check Cashing et al*., No. 12-cr-560 (C.D. Cal. 2013), the manager

2 and designated AML compliance officer of a check cashing store were indicted and, months later,

3 pleaded guilty to BSA violations involving their personal, deliberate failure to file CTRs.[49]  The

4 government described the manager as the "leader of a check-cashing conspiracy" who directly

5 "facilitated health care fraud and likely other crimes by providing untraceable cash to criminals to

6 fund their criminal schemes, hide profits, and avoid detection by law enforcement."[50]  "Additional

7 aggravating factors include [the manager's] lies to federal agents . . . , conviction for driving under

8 the influence with a blood alcohol level twice the legal limit, [and] arrest for possession of 57

9 marijuana plants at his residence along with scales and packaging materials."[51]  The manager also

10 had "no history of legitimate employment," and he "was on probation from [a prior conviction]

11 while he committed the instant offense."[52]  The manager's effective Guideline range was 60

12 months for two charges—the BSA violation and one count of conspiracy to commit reporting

13 failures—and the court imposed a sentence of 60 months' imprisonment.  As for the designated

14 AML compliance officer, he not only was "aware of [unlawful] transactions, he at times

15 participated in them."[53]  The AML officer also had "an extensive criminal history" and "at the

16 time [he] committed the instant offense, he was on probation resulting from a previous

17 conviction."[54]  The AML officer's Guideline range was 10 to 16 months, and he was sentenced to

18 8 months of imprisonment.  These facts and circumstances bear no resemblance to Mr. Zhao's

19 case.

20

21

---

22 [49] *Los Angeles Check Cashing Store, Its Head Manager and Compliance Officer Sentenced for Violating Anti-money
23 Laundering Laws*, DOJ Press Release (Jan. 14, 2013), available at https://www.justice.gov/opa/pr/los-angeles-
check-cashing-store-its-head-manager-and-compliance-officer-sentenced-violating.

24 [50] *U.S. v. G & A Check Cashing et al*., No. 12-cr-560 (C.D. Cal. 2013), Dkt. 83, at 1.

[51] *Id.*

25 [52] *Id.* at 22-23.

26 [53] *Id.*, Dkt. 85, at 1.

[54] *Id.* at 5.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

35

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1          *Third*, in *U.S. v. Ali*, No. 17-cr-224 (N.D. Tex. 2017), the operator of a check-cashing

2    business was indicted on 31 counts of bank fraud, conspiracy, embezzlement, aggravated identity

3    theft, and failing to maintain an effective AML program, and pleaded guilty to the AML charge.

4    The defendant personally negotiated and cashed 3,423 U.S. Treasury checks totaling $16.6 million,

5    the majority of which were "obtained through fraud, either because the checks were based on

6    fraudulent federal tax returns or because the checks had been stolen."[55]  He also "drastically

7    minimized his role in the offense," rather than accept responsibility fully, as Mr. Zhao has done.[56]

8    Mr. Ali was sentenced to 13 months of imprisonment.

9          Unlike the defendants in *Randol*, *Ali*, and *G & A Check Cashing*, Mr. Zhao did not

10   participate in fraud or unlawful transactions.  He is not a recidivist; indeed, he has no criminal

11   history whatsoever.  He did not lie to federal agents or obstruct justice.  He was not a designated

12   compliance officer with expertise in U.S. AML and BSA requirements.  He did not minimize his

13   offense conduct.  Instead, he is a first-time offender who built a Company of enormous social

14   utility.  He led Binance to become a regulated crypto exchange in a number of jurisdictions.  He

15   pleaded guilty.  ████████████████████████████████████████████

16   He is a committed, loving parent with a lifelong record of charity, community engagement, and

17   contributions to the greater good.  *Randol*, *Ali*, and *G & A Check Cashing* thus are *not* apt

18   precedents for sentencing Mr. Zhao because the defendants in those cases were not remotely

19   similarly situated to Mr. Zhao.

20         In fact, most often, individual criminal charges are not even filed at all for a BSA violation

21   like Mr. Zhao's.  When U.S. financial institutions such as JPMorgan Chase,[57] Western Union,[58]

---

[55] *McKinney Man Pleads Guilty to Fraudulently Obtaining and Cashing $16 Million in U.S. Treasury Checks*, DOJ Press Release (June 19, 2017), available at https://www.justice.gov/usao-ndtx/pr/mckinney-man-pleads-guilty-fraudulently-obtaining-and-cashing-16-million-us-treasury.

[56] *U.S. v. Ali*, No. 17-cr-224 (N.D. Tex. Apr. 19, 2017), Sentencing Tr. at 4.

[57] Deferred Prosecution Agreement, Ex. C, *U. S. v. JPMorgan Chase Bank, N.A.*, (S.D.N.Y. 2014), available at https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/JPMC%20DPA%20Packet%20 (Fully%20Executed%20w%20Exhibits).pdf.

[58] *U.S. v. The Western Union Co.*, No. 17-cr-11 (M.D. Pa. 2017), Dkt. 3.

and MoneyGram[59] resolved BSA charges in recent years, they did so through corporate deferred prosecution agreements ("DPAs"), and no individuals—let alone any CEOs—faced charges at all, despite details in the DPAs of individual misconduct in each of those cases.  For instance, in the JPMorgan Chase matter, the government filed and deferred criminal charges relating to the bank's conduct in regard to Bernard Madoff's Ponzi scheme, and required the bank "to pay a $1.7 billion penalty to the victims of the Madoff fraud."[60]  That is, unlike here, there were actual, identifiable victims of fraud.  No officers, executives, or employees of the bank were prosecuted, even though the government stated that a senior executive, for example, "was told by a senior colleague that there is a 'well-known cloud over the head of Madoff and that his returns are speculated to be part of a Ponzi scheme.'"  *Id.*  And, as the government noted, "while certain senior compliance officers in the United States were provided with all of the relevant facts[,] . . . the U.S. compliance officers did very little to investigate those suspicions, failed to raise these concerns with the bank's anti-money laundering department, and failed to file a [Suspicious Activity Report ("SAR")]."  *Id.*  The government did not charge any individual with a crime.

Notably, in its own sentencing submission against Binance on February 16, 2024, the government cited as comparable to Binance four major prosecutions of "large financial institutions" where "the criminal conduct of those defendants threatened the integrity of the U.S. financial system": BNP Paribas ("BNPP") (2015); Rabobank (2018); UniCredit Bank (2019); and Danske Bank (2022).[61]  All involved more egregious offenses not found in Mr. Zhao's case, such as defrauding the United States and violating the Trading with the Enemy Act ("TWEA").  And yet, the government did not bring criminal charges against a single individual in any of these four cases that the government itself has cited as comparable.

---

[59] *U.S. v. MoneyGram Int'l, Inc.*, No. 12-cr-291 (D. Minn. 2018), Dkt. 34-2.

[60] *Manhattan U.S. Attorney And FBI Assistant Director-In-Charge Announce Filing Of Criminal Charges Against And Deferred Prosecution Agreement With JPMorgan Chase Bank, N.A., In Connection With Bernard L. Madoff's Multi-Billion Dollar Ponzi Scheme*, DOJ Press Release (Jan. 7, 2014) available at https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-and-fbi-assistant-director-in-charge-announce-filing-criminal.

[61] *Binance*, No. 23-cr-178, Dkt. 32 at 10.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

37

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    In the BNPP case, the world's fourth largest bank paid $8.9 billion and pleaded guilty to

2    conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and TWEA

3    by processing billions of dollars of transactions through the U.S. financial system on behalf of

4    Sudanese, Iranian, and Cuban entities subject to U.S. economic sanctions.[62]   The bank did not

5    simply fail to maintain an effective AML program; the government stated that it "went to elaborate

6    lengths to conceal prohibited transactions, cover its tracks, and deceive U.S. authorities."   The

7    resolution documents also referenced culpable officers and executives.   For example, the

8    government noted that "a senior compliance officer at BNPP wrote to other high-level BNPP

9    compliance and legal employees reminding them that certain Sudanese banks with which BNPP

10   dealt 'play a pivotal part in the support of the Sudanese government which . . . has hosted Osama

11   Bin Laden and refuses the United Nations intervention in Darfur.'"[63]  And yet, again, no individual

12   charges were filed in this case.

13    Similarly, in the Rabobank case, the bank pleaded guilty to conspiring with "several former

14   executives" to impair, impede, and obstruct its primary regulator, the Office of the Comptroller of

15   the Currency ("OCC"), by concealing deficiencies in its AML program and by obstructing the

16   OCC's examination of Rabobank.[64]  Again, there were statements by the government about high-

17   level individual culpability in the case: "Rabobank executives actively sought to hide and minimize

18   the deficiencies in its AML program in an effort to deceive the regulators as to its true state in

19   hopes of avoiding regulatory sanctions that had previously been imposed on Rabobank in 2006

20   and 2008 for nearly identical failures."[65]   And yet, despite the involvement of executives in

---

[62] *BNP Paribas Agrees to Plead Guilty and to Pay $8.9 Billion for Illegally Processing Financial Transactions for Countries Subject to U.S. Economic Sanctions*, DOJ Press Release (June 30, 2014), available at https://www.justice.gov/opa/pr/bnp-paribas-agrees-plead-guilty-and-pay-89-billion-illegally-processing-financial#:~:text=BNPP%2C%20the%20world%27s%20fourth%20largest,Sudan%2C%20Iran%2C%20and%20Cuba..

[63] *Id.*

[64] *Rabobank NA Pleads Guilty, Agrees to Pay Over $360 Million*, DOJ Press Release (Feb. 7, 2018), available at https://www.justice.gov/opa/pr/rabobank-na-pleads-guilty-agrees-pay-over-360-million.

[65] *Id.*

1    obstructive conduct, only a single Rabobank Vice President received a DPA; he was not made to

2    plead guilty, and no one else was charged.[66]

3        In the UniCredit Bank case, the bank pleaded guilty to conspiring to violate IEEPA and

4    defraud the United States by processing hundreds of millions of dollars of transactions through the

5    U.S. financial system on behalf of an entity designated as a weapons of mass destruction

6    proliferator and other Iranian entities subject to U.S. economic sanctions.[67]  Unlike Binance, this

7    case did not involve automated systems that randomly matched U.S. users with users in sanctioned

8    countries.  According to the government, UniCredit "knowingly and willfully moved at least $393

9    million through the U.S. financial system on behalf of sanctioned entities . . . through a scheme,

10   formalized in its own bank polices and designed to conceal from U.S. regulators and banks the

11   involvement of sanctioned entities in certain transactions."[68]  Although UniCredit pleaded guilty

12   to a conspiracy, no individuals were charged.

13       Finally, Danske Bank paid $2 billion and pleaded guilty to conspiracy to commit bank

14   fraud in connection with lies about its AML controls.[69]  The government highlighted that the bank

15   "funnel[ed] billions of dollars in suspicious and criminal transactions through the United States,"

16   and bank "employees conspired with . . . customers to shield the true nature of their transactions,

17   including by using shell companies that obscured actual ownership of the funds."[70]  The plea

18   agreement indicates that at least two high-level compliance officers, and several executives, were

19   aware of and failed to stop the criminal conduct, and that several other employees knowingly made

20   false statements in furtherance of the conspiracy; in fact, the plea agreement is replete with

21

22   [66] *Id.*

23   [67] *UniCredit Group Banks Agree to Pay Over $1.3 Billion for Violating Sanctions*, DOJ Press Release (Apr. 15, 2019), available at https://www.justice.gov/opa/pr/unicredit-bank-ag-agrees-plead-guilty-illegally-processing-transactions-violation-iranian.

24   [68] *Id.*

25   [69] *Danske Bank Pleads Guilty to Fraud on U.S. Banks in Multi-Billion Dollar Scheme to Access the U.S. Financial System*, DOJ Press Release (Dec. 13, 2022), available at https://www.justice.gov/opa/pr/danske-bank-pleads-guilty-fraud-us-banks-multi-billion-dollar-scheme-access-us-financial.

26

[70] *Id.*

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)                39

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    specific, stipulated facts about culpable individual conduct.[71]  Yet again, despite the conspiracy

2    charge and the culpability of identifiable employees, no individuals were prosecuted.

3        The government almost certainly will try to portray the present case to the Court in

4    hyperbolic terms as the worst exemplar of these types of violations.  It is not.  The cases above

5    variously involved comparable and even larger fines; billions of dollars in transactions involving

6    sanctioned countries and a weapons of mass destruction proliferator; active concealment; and

7    measurable harm—$1.7 billion—to actual, identifiable victims of the Madoff fraud.  Yet not a

8    single person was charged, much less sentenced to prison, in any of those cases.  The fact that Mr.

9    Zhao's case relates to the cryptocurrency industry in general, or Binance in particular, is not a valid

10   basis for differential treatment.

11       The reality is that Mr. Zhao has chosen to accept responsibility for an offense which rarely

12   leads to any criminal charges at all, let alone against the CEO of a financial institution.  The few

13   similar cases that have been charged have resulted, overwhelmingly, in sentences of probation.

14   And the scant handful of defendants who have been sentenced to prison in cases involving BSA

15   violations have had criminal histories and aggravating facts not remotely present here.

16       The government is, of course, free to exercise its prosecutorial discretion.  But it is *not* free

17   to ignore the prohibition on unwarranted sentencing disparities.  To sentence Mr. Zhao to a term

18   of imprisonment would be a significant departure from precedent—one that is unwarranted in this

19   case; is inconsistent with his lack of criminal history, complete acceptance of responsibility, ██

20   ████████; and cannot be justified by any recidivism, additional charges, or other aggravating

21   circumstances.  As in every similar case, the appropriate sentence here is probation.

22       **F.    Mr. Zhao's Sentence Should Account for the Harsher Conditions He Would**

23              **Face, as a Noncitizen, If Incarcerated**

24       The sentence imposed here also should take into account that Mr. Zhao, who is not a U.S.

25   citizen, will unfairly face harsher realities if imprisoned than a similarly-situated citizen.

26   ----

[71] Plea Agreement, Attachment A - Statement of Facts (Dec. 13, 2021), available at https://www.justice.gov/opa/pr/danske-bank-pleads-guilty-fraud-us-banks-multi-billion-dollar-scheme-access-us-financial.

Probation's recommendation that Mr. Zhao serve five months with no period of supervised release takes into account that, at the conclusion of any term of imprisonment, Mr. Zhao would enter removal proceedings at an ICE facility, effectively resulting in secondary detention for an unknown period of time. *See* Sentencing Recommendation, at 7; *see also* Ex. C, Decl. of J. Sickler, at ¶¶ 24, 26-30; U.S.S.G. § 5D1.1. This is an appropriate and important consideration.

A critical additional factor, which Probation's recommendation does not reflect, is that Mr. Zhao will face harsher and more dangerous conditions during any term of incarceration than a U.S. citizen, solely on account of his status as a noncitizen. Pursuant to BOP policy, as a noncitizen Mr. Zhao is ineligible for a minimum-security facility—where a similarly-situated U.S. citizen would be designated—and instead must be housed in at least a low-security facility. *See* Ex. C, Decl. of J. Sickler, at ¶¶ 7-11, 22. The confinement conditions are appreciably more restrictive, there are fewer work and program opportunities, and the inmate population as a whole is more dangerous in low-security facilities than in minimum-security facilities. *See* Ex. C, Decl. of J. Sickler, at ¶¶ 13-18.

The Court's sentence should account for all of these realities. In sentencing, courts must consider an "increased severity in the conditions of confinement [that] result[s] from alien status." *U.S. v. Lopez-Salas*, 266 F.3d 842, 849 (8th Cir. 2001) (citing *U.S. v. Davoudi*, 172 F.3d 1130, 1134 (9th Cir. 1999)). The then-Chief Judge of the SDNY recognized this inequity just a few years ago in determining what sentence to impose for a defendant's fraud conviction:

> If I could sentence Mr. Black to a term of incarceration—a brief term of incarceration—knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a non-citizen . . . he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. . . . And for reasons that are incomprehensible to me, were I to sentence him to a short term of imprisonment—which would be served in a private facility and not at some place like FCI Allenwood, . . . at the end of that term he could not walk out the door and be picked up . . . and taken to the airport. He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. And that's not right.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

41

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1  *U.S. v. Connolly, et al.*, No. 16-cr-370 (S.D.N.Y. 2019), Dkt. 451, at 91. Despite a Guideline range

2  of 57 to 71 months' imprisonment, the court sentenced Mr. Black to "time served, plus three years

3  of supervision, to include a term of nine months' home confinement to be served in the United

4  Kingdom." *U.S. v. Connolly et al*, No. 16-cr-370 (S.D.N.Y. 2019), Dkt. 451, at 95.

5          Similarly, in *U.S. v. Cohen*, the court sentenced the defendant, a French citizen convicted

6  of insider trading, to time served and one year of supervised release despite a Guideline range of

7  30-37 months' imprisonment. No. 19-cr-741 (S.D.N.Y. 2020), Dkt. 48, at 29, 44. In so doing, the

8  court took into account the harsh consequences that the defendant would face as a noncitizen if

9  incarcerated: the defendant would be "unable to serve terms of imprisonment in a camp or

10  minimum-security facility. And when foreign nationals complete a term of imprisonment, they

11  are transferred to ICE detention where they can wait for an indefinite period to be returned to their

12  home country." *U.S. v. Cohen*, No. 19-cr-741 (S.D.N.Y. 2020), Dkt. 48, at 42. Numerous other

13  courts have similarly granted downward variances because of the unjustly harsh reality that

14  incarceration would impose based on defendants' citizenship status. *See, e.g.*, *U.S. v. Walchli*, No.

15  20-cr-000497 (S.D.N.Y. 2024), Dkt. 110, 111 (non-U.S. citizen who voluntarily traveled to the

16  United States to plead guilty, and who faced a Guideline range of 18-24 months, sentenced to time

17  served); *U.S. v. Lewis*, No. 23-cr-370 (S.D.N.Y. 2024), Dkt. 66, 67, 69 (sentencing defendant, a

18  non-U.S. citizen convicted of securities fraud and who faced a Guideline Range of 18-24 months,

19  to three years' probation, to be served at home abroad); *U.S. v. Bakeas,* 987 F. Supp. 44, 48-49 (D.

20  Mass. 1997); *U.S. v. Simalavong*, 924 F. Supp. 610, 611 (D. Vt. 1995); *U.S. v. Ferreria,* 239 F.

21  Supp. 2d 849, 849-50 (E.D. Wis. 2002).[72]

22          Like the defendants in those cases, if incarcerated, Mr. Zhao would necessarily face a

23  harsher punishment than similarly-situated defendants solely by virtue of his citizenship status.

24  _____

25  [72] *See also* Francesca Brody, *Extracting Compassion from Confusion: Sentencing Noncitizens After U.S. v. Booker*,
79 FORDHAM L. REV. 2129, 2171-72 (2011) ("when a defendant can show that deportation, lack of access to prison

26  benefits, and prolonged immigration detention will increase the severity of his sentence, § 3553 requires offsetting
those factors to avoid violating the parsimony principal" that demands every sentence be "'sufficient, but not greater
than necessary,' to accomplish the goals of punishment").

As noted above, pursuant to BOP policies, as a noncitizen Mr. Zhao is ineligible for minimum-security facilities and instead must be housed in at least a low-security facility.  *See* Ex. C, Decl. of J. Sickler, at ¶ 11.  In the Seattle area, this likely means confinement in the Federal Detention Center—SeaTac ("SeaTac"), which has recently struggled with significant staffing and other concerns, including violence against inmates.  *See* Ex. D, Decl. of R. Palmquist, at ¶¶ 8, 11-12. Recent reporting describes SeaTac as "severely short-staffed," with a vacancy rate for correctional officers of approximately 50%.[73]  SeaTac is categorized as an "administrative facility" by the BOP, which are institutions for special missions, including "containment of extremely dangerous, violent, or escape-prone inmates," unlike minimum-security facilities which generally house non-violent, first-time offenders.  *See* Ex. C, Decl. of J. Sickler, at ¶ 21.  And notably, the ICE detention facility in Washington where Mr. Zhao would most likely be held following a period of incarceration at SeaTac has recently been the subject of extensive reporting for its history of human rights violations, allegations of neglect, reports of sexual assault and abuse, and setting of national records for placement of inmates into solitary confinement.  *See* Ex. C, Decl. of J. Sickler, at ¶ 29. Similarly situated defendants who are U.S. citizens would not face these conditions.[74]

The likelihood that Mr. Zhao would face personal harm or other threats in these volatile environments is amplified once his personal characteristics are taken into account.  His high public profile and instant recognizability as a wealthy entrepreneur may make him a target for threats, intimidation, and extortion.  *See* Ex. D, Decl. of R. Palmquist at ¶¶ 13-18.  ██████████████

███████████████████████████████████████████████████████

███████████████████████    Mr. Zhao "should not be disparately treated simply because he

---

[73] *SeaTac federal jail struggles with 50% vacancy rate for key positions,* THE SEATTLE TIMES (Jan. 2, 2024), available at https://www.seattletimes.com/seattle-news/seatac-federal-jail-struggles-with-50-vacancy-rate-for-key-positions/.

[74] In addition, as a noncitizen, Mr. Zhao is unlikely to be able to receive the benefits of a "split sentence" (i.e., a term of imprisonment followed by supervised release) because BOP likely will be required to transfer custody of Mr. Zhao to ICE at the completion of his term of imprisonment.  Accordingly, as Probation recognized, instead of serving the second half of a "split sentence" under supervised release, he would remain detained at an ICE facility awaiting removal proceedings.  Sentencing Recommendation, at 7; *see also* Ex. C, Decl. of J. Sickler, at ¶ 24.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

43

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1   is a noncitizen," when "[h]e is, in every way, the opposite of an offender who resided in the United

2   States illegally, who committed a violent offense, who also had prior offenses—who would be

3   considered a dangerous flight risk."  Ex. C, Decl. of J. Sickler, at ¶ 33.

4           As reflected in the cases discussed above, courts have avoided these unwarranted

5   disparities by imposing sentences of time served or probation that allowed defendants to return to

6   their home countries.  *See, e.g.*, *U.S. v. Robson, et al.*, No. 14-cr-272 (S.D.N.Y. 2014) (permitting

7   defendants Robson, Yagami, and Stewart—all foreign citizens convicted of conspiracy to commit

8   wire and bank fraud—to serve their sentences of supervised release abroad, at home in the U.K.

9   and Hong Kong); *U.S. v. Liew*, No. 17-cr-01 (N.D. Ill. 2021) (sentencing defendant, a Singaporean

10  citizen convicted of conspiracy to commit wire fraud who faced a Guideline range of 12-18 months

11  , to time served (satisfied by his surrender date) and permitting him to return home).  In some cases

12  involving fraud convictions, courts have imposed an additional requirement that a defendant serve

13  home confinement for a period of time in his home country.  *See Connolly*, No. 16-cr-370

14  (S.D.N.Y. 2019), Dkt. 451, at 95 (sentence of time served, plus three years of supervision including

15  nine months of home confinement to be served in the U.K.); *U.S. v. Sarao*, No. 15-cr-75 (N.D. Ill.

16  2015), Dkt. 121 (sentence of one year of supervised release with a condition of home confinement

17  in the U.K.).  For Mr. Zhao's offense—failure to implement a BSA-compliant AML program—

18  no relevant case has ever resulted in incarceration in the first place.  *See* Section IV.E.  Based on

19  all the facts and circumstances here, a term of probation that allows Mr. Zhao to return home is

20  the only necessary or appropriate sentence.

21          Of the relevant cases, all of which resulted in time served or probation, only Mr. Hayes of

22  BitMEX received a sentence of probation that included home confinement, for a period of six

23  months which Mr. Hayes (a U.S. citizen) served in the United States.  *See U.S. v. Hayes*, No. 20-

24  cr-500 (S.D.N.Y. 2022), Dkt. 342, Dkt. 344.  As discussed above, Mr. Hayes's sentencing

25  presented aggravating circumstances not found here, and his six months of home confinement

26  followed 20 months of freedom to travel and reside where he wished.  *See* Section IV.E.  We

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

44

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1    respectfully submit that no such period of home confinement is needed or appropriate here,

2    particularly in light of Mr. Zhao's extraordinary remediation, acceptance of responsibility, ███

3    ████████, which should result in a sentence no worse than the probation served by the other

4    founders of BitMEX, one of whom (the U.K. citizen) was allowed to reside and travel abroad

5    without restriction. *See U.S. v. Delo*, No. 20-cr-500 (S.D.N.Y. 2022), Dkt. 360, Dkt. 380.

6          To the extent the Court determines that a period of home confinement is necessary,

7    however, counsel for Mr. Zhao has consulted with a highly reputable U.S.-based global security

8    firm with extensive judicial and law enforcement experience that designs and administers home

9    confinement, including the home confinement in the U.K. served by Mr. Black in the *Connolly*

10    case discussed above. This security firm has prepared a plan for supervision of home confinement

11    in the UAE which the Court could impose here. Further detail regarding this proposal is included

12    in Ex. E.[75] We include this information as a further demonstration of Mr. Zhao's commitment to

13    accepting responsibility and not seeking special treatment, even though such a condition is

14    unnecessary in this case because probation is the appropriate sentence.

15        **G.**    **The Remaining 18 U.S.C. § 3553(a) Factors Also Support Probation**

16            **1.**    **Deterrence**

17          Mr. Zhao is a first-time offender who presents no meaningful risk of recidivism. He does

18    not need to be specifically deterred from re-offending. Mr. Zhao's life has already been

19    fundamentally altered by his guilty plea. He has resigned from his role at the Company he founded

20    and turned over Binance to new management. He has already paid significant fines of $100

21    million, with more to be paid in the coming months, on top of the billions that the Company has

22    committed to pay at his direction, and he has been subject to presentence conditions of release that

23    have limited his ability to travel beyond the United States—separating him from his family in the

24

25    [75] While Probation noted as a general matter that it did not believe private supervision outside of the United States
would hold Mr. Zhao sufficiently accountable to the Court, Sentencing Recommendation, at 7, the detailed

26    supervision proposal included here for the Court's consideration—which Probation did not have an opportunity to
review—demonstrates that supervision at Mr. Zhao's home would be at least as strict as supervision in the United
States, if not more so. *See* Ex. E.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)    45

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

1  UAE—for over five months.  His personal and professional relationships, and the opportunities

2  available to him in the future as a convicted felon, have been fundamentally altered by this case.

3  Moreover, the scale and scope of this landmark matter already act as a significant deterrent.

4  Public reporting in the aftermath of the global settlement indicates that the Company's $4.3 billion

5  fine, to which Mr. Zhao agreed, was intentionally "set at a high level to act as a deterrent to other

6  groups," according to a CFTC Commissioner.[76]  Surrendering his leadership position with the

7  Company and committing it to significant additional compliance undertakings and a monitorship

8  also fulfill this goal.  With such meaningful deterrents already in place, imposing an unduly harsh

9  sentence on Mr. Zhao is unnecessary and would not serve to further deter the public from

10  committing a similar offense.  In fact, it could have the opposite effect, deterring other defendants

11  from engaging in the kind of acceptance of responsibility and cooperation found here.

12  The government's legitimate interest in deterrence must be balanced against the

13  characteristics of the individual defendant and case.  *See U.S. v. Barker*, 771 F.2d 1362, 1369 (9th

14  Cir. 1985) (vacating multiple sentences after finding the district court was "motivated by the desire

15  for general deterrence to the exclusion of adequate consideration of individual factors").  The Ninth

16  Circuit has held that it is a "categorical imperative that no person may be used merely as an

17  instrument of social policy, that human beings are to be treated not simply as means to a social end

18  like deterrence, but also—and always—as ends in themselves." *Id.* at 1368-69.

19  Mr. Zhao's sentence cannot be predicated solely on the government's interest in deterring

20  similar activity by others in the future.  Any sentence must take into account Mr. Zhao's individual

21  characteristics, all of which favor a sentence of probation.  As Judge Koeltl of the SDNY noted in

22  regard to general deterrence in sentencing the former CEO of BitMEX in May 2022:

23  [A]ny sentence must be just for the individual defendant.  If we impose the sentence
24  on the basis of general deterrence that wasn't just for the individual defendant, we
   would end up using the law to impose sentences on individuals that were not just
25  for the individual defendants, and that would be contrary to our law.  So you expect

26  [76] *Binance's $4.3bn fine was set high as a warning, says US regulator*, FINANCIAL TIMES (Dec. 5, 2023), available at
https://www.ft.com/content/81bdaf30-3f61-4ff4-4b579-805a4af8f8e1.

that a sentence which is just for the individual defendant will be sufficient for purposes of general deterrence, and *you ought not to be able to attempt to justify a sentence based upon the message that it sends to others unless you can say that the sentence is just for the individual that you're sentencing.*  Otherwise, you're just using that defendant in a way that's not just for the individual defendant.

*U.S. v. Hayes*, No. 20-cr-005 (S.D.N.Y. 2022), Sentencing Tr. at 51:12-25 - 52:1 (emphasis added).  As in that case, the government here cannot justify imprisonment of Mr. Zhao "based upon the message that it sends to others."  *Id.* at 51:22.

At the government's November 21, 2023 press conference announcing this matter, the Deputy Attorney General stated that "[t]oday's charges and guilty pleas—combined with a more than $4 billion financial penalty—sends an unmistakable message to crypto and defi companies: if you serve U.S. customers, you must obey U.S. law."[77]  Said another way: the government has already publicly broadcast its message of general deterrence, accompanied by unprecedented financial penalties and extensive compliance requirements.  Mr. Zhao cannot and should not be used to continue pushing that message in the form of a sentence harsher than any previously handed down for similarly-situated defendants, and he certainly should not be punished more severely simply because the government has branded him—and his Company—as its largest target to send such a message.

### 2.    Protection of the Public

No incarceration is necessary to protect the public from Mr. Zhao.  He did not steal from or aim to harm anyone, PSR ¶ 53, and there is no basis to conclude that Mr. Zhao presents any ongoing risk to the public—a fact which the government itself has already acknowledged and

---

[77] *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, DOJ Press Release (Nov. 21, 2023), available at https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.  In fact, in response to a reporter's question as to whether the government's resolution with Binance and Mr. Zhao was significant enough when "there might be a situation in which nobody goes to jail," the Acting Assistant Attorney General did not say that anyone should or would or needed to go to jail, emphasizing instead that the financial penalties, guilty pleas, monitorship, cooperation, and requirement that Mr. Zhao step down as CEO had already made it a very significant resolution that clearly communicated the requirements of U.S. law to the global industry.  *See Binance and CEO Plead Guilty to Federal Charges in $4B Resolution,* DOJ Press Release (Nov. 21, 2023), at 31:04 - 33:01, available at https://www.justice.gov/opa/video/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

47

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

stated on the record in connection with bail. *See* Dkt. 29. Probation, too, agrees that "he does not seem to be a continued danger to the community." Sentencing Recommendation, at 7.

### 3. Needed Training or Rehabilitation

Mr. Zhao does not require any special training or rehabilitation. Moving forward, he seeks to focus primarily on devoting time to his family and giving back to his local community, as well as pursuing new philanthropic projects outside the cryptocurrency space, particularly in global youth education and biotechnology.

### 4. Seriousness of the Offense, Respect for the Law, and Just Punishment

Mr. Zhao recognizes that his BSA violation is a serious offense and accepts full responsibility. He understands the gravity of his actions and is committed to accepting a just punishment. That is why he traveled here from a non-extradition country to plead guilty. But this is Mr. Zhao's first encounter with the justice system, and he has no criminal history. As discussed above, and as noted in the PSR, Mr. Zhao has demonstrated extraordinary acceptance of responsibility ██████████████████████████████████████████████ ███████████████████████.

A sentence of probation here is just punishment and will promote respect for the law. Among the relevant considerations is the degree of harm caused by the defendant's conduct. *See U.S. v. Harder*, 144 F. Supp. 3d 1233, 1240-41 (D. Or. 2015) ("With regard to the concept of 'just punishment,' it is fair to conclude that the punishment must fit the crime; that includes an assessment of the harm caused and the intentionality of the defendant . . . . the Court must attempt to avoid unwarranted sentence disparities among defendants with similar criminal records who have been found guilty of similar conduct."). Here, while Mr. Zhao's offense was serious, he did not in any way steal from or aim to harm anyone. Failing to implement an effective AML program is not the same as engaging in money laundering, much less fraud or misappropriation of customer funds.

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)

48

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200

As discussed above, "the collateral effects of a particular sentence" must also be taken into account.  *U.S. v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).  Mr. Zhao has surrendered control of the Company he founded and has sustained significant reputational damage in light of his conviction—factors that courts have determined favor leniency.  *See U.S. v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming district court's downward departure where defendant "suffered atypical punishment such as the loss of his reputation and his company"); *U.S. v. Lewis*, No. 23-cr-370 (S.D.N.Y. 2024), Sentencing Tr. at 30:18-31:1 (sentencing defendant to probation abroad where the "case has garnered significant press" and "the damage to [the defendant's] reputation, along with the embarrassment and shame that [the defendant] has acknowledged . . . is certainly a deterrent").[78]

In light of Mr. Zhao's fulsome acceptance of responsibility, ███████ history of philanthropy and community building, the lack of precedent for sentencing any similarly-situated defendant to prison, and the collateral consequences from his conviction, a probationary sentence here both is just and will promote respect for the law, especially by incentivizing others to follow Mr. Zhao's example and fully accept responsibility, remediate, ████████.  The government has used this case to send "an unmistakable message."[79]  The Court can, too.  The message should be that unflinching acceptance of responsibility matters.  Self-surrendering voluntarily from a non-extradition country matters.  Remediation matters. ███████████  The public should know that the U.S. justice system is capable of nuanced, individualized assessments, and that defendants who take every possible step on the right path will be recognized with lenience.

---

[78] Moreover, the Sentencing Commission has recently recognized that many defendants with no criminal history should be afforded leniency, recognizing that data show such defendants are less likely to recidivate.  *2023 Amendments in Brief*, U.S. SENTENCING COMM'N, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf.  The Sentencing Commission's clear policy and recognition that defendants like Mr. Zhao do not commit additional crimes provide further support for a sentence of probation.

[79] *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, DOJ Press Release (Nov. 21, 2023), available at https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

1

## V.   **CONCLUSION**

2      This is a high-profile matter, but Mr. Zhao still deserves to be sentenced based on the facts

3 of his case and his personal circumstances.  He is a first-time, non-violent offender who committed

4 an offense with no intention to harm anyone.  He presents no risk of recidivism.  He has appeared

5 in this country voluntarily to accept responsibility.  He has already suffered enormous collateral

6 consequences.  Despite the initial failures that led to this prosecution, he has transformed Binance

7 into an industry leader on compliance.  These factors appropriately led Probation to recommend a

8 modest downward variance.  The Court should go farther to reflect three additional, crucial factors.

9 ████████████████████████████████████████████  it is exceedingly rare (if it *ever*

10 happens) for such a first-time offender with a Guideline range comparable to Mr. Zhao's to be

11 sentenced to a term of imprisonment after pleading guilty, especially pre-indictment.  He would

12 face harsher and more dangerous conditions of confinement than a similarly situated U.S. citizen.

13 And all relevant BSA precedents point to a sentence of probation.  For these reasons and the others

14 set forth above, a sentence of probation is just and appropriate, in line with precedent, and not

15 greater than necessary to accomplish the goals of sentencing Mr. Zhao as an individual, based on

16 the totality of facts and circumstances and his lifetime of good works.

17
      Dated: April 23, 2024

18

19                                            By /s/ Benjamin Naftalis
                                                 Benjamin Naftalis (*pro hac vice*)
20                                               Douglas K. Yatter (*pro hac vice*)
                                                 Eric Volkman (*pro hac vice*)
21                                               Savannah Burgoyne (*pro hac vice*)
                                                 LATHAM & WATKINS LLP
22                                               1271 Avenue of the Americas
                                                 New York, NY 10020
23                                               Tel: (212) 906-1200
                                                 Fax: (212) 751-4864
24                                               benjamin.naftalis@lw.com
                                                 douglas.yatter@lw.com
25                                               eric.volkman@lw.com
                                                 savannah.burgoyne@lw.com

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

/s/ William Burck
William Burck (*pro hac vice*)
Avi Perry (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
williamburck@quinnemanuel.com
aviperry@quinnamemanuel.com

/s/ Mark Bartlett
Mark Bartlett
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Tel: (206) 757-8298
markbartlett@dwt.com

*Attorneys for Changpeng Zhao*

1

<u>CERTIFICATE OF SERVICE</u>

2

3      I, Benjamin Naftalis, certify that on April 23, 2024, I electronically filed the foregoing with

4  the Clerk of the Court using the CM/ECF system, which will notify such filing to all participants

5  in this case.

By  */s/ Benjamin Naftalis*

6                                                          Benjamin Naftalis
                                                           Latham & Watkins LLP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT CHANGPENG ZHAO
(*United States v. Changpeng Zhao*, CR23-179-RAJ)        52

LATHAM & WATKINS LLP
1271 Avenue of the Americas, New York, NY 10020
(212) 906-1200